**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harold HAIMOWITZ,
Defendant-Appellant.**

**No. 81–6011.**

United States Court of Appeals,
Eleventh Circuit.

June 13, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 15, 1983.

Lacy Mahon, Jr., Mahon, Mahon & Farley, Jacksonville, Fla., for defendant-appellant.

Elizabeth E. Hoyt, John E. Steele, Asst. U.S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY, Circuit Judge, and PITTMAN *, District Judge.

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

PITTMAN, District Judge:

In this case the defendant appeals his conviction on one count for conspiracy and on eight substantive counts for possession of false and fraudulent documents in connection with the fraudulent obtaining and misapplication of the proceeds of a Small Business Administration (SBA) loan. The defendant raises numerous issues on appeal. We consider the defendant's points seriatim and affirm his conviction.

Appellant Harold Haimowitz, Irving R. Bowen, Jr., Frederick W. Bower, Frederick E. Bacon, Harold Bloom, and Sam L. Silberstein were indicted on January 23, 1980. It was an eighteen count indictment. Two of the defendants, Irving R. Bowen, Jr. and Frederick W. Bower, were subsequently severed; as a result of these severances, counts twelve and eighteen of the original indictment were severed. Of the remaining sixteen counts the appellant, Harold Haimowitz, was charged in nine counts either individually or with one of the defendants with criminal acts occurring from on or about October 1, 1979 through August 31, 1980.[1]

In late September or early October, 1979, Peter Abbott contacted appellant Haimo-

1. Count One of the indictment charged that defendants herein, and Peter Abbott, did knowingly and willfully conspire, combine, confederate and agree among themselves, and with others, both known and unknown to the grand jury, to defraud the United States, that is, the Small Business Administration, an agency of the United States, and to violate the laws of the United States, to-wit:

a) To make material false statements and reports in applications for loans and advances, for the purpose of influencing the action of a bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 1014.

b) To possess false, forged, altered and counterfeit writing and documents, with the intent to defraud the United States and agencies thereof, and for the purpose of enabling another to obtain money from the United States or an agency thereof, in violation of Title 18, United States Code, Section 1002.

c) To make and use a false writing and document knowing the same to contain false, fictitious and fraudulent statements and entries in matters within the jurisdiction of the Small Business Administration, an agency of the United States, in violation of Title 18, United States Code, Section 1001.

d) To misapply more than $100 of the monies, funds, and credits of a bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, by an officer, and employee of said bank, in reckless disregard of the interests of said bank, in violation of Title 18, United States Code, Section 656.

Among the manner and means by which the defendants would and did carry out the conspiracy were the following:

1) Defendant, Harold Haimowitz, used his position as an attorney, past experience in business and real estate, and knowledge of the community to: create false, fictitious and fraudulent documents, writings, applications and reports; recruit necessary, willing and cooperative persons and firms to join the conspiracy; provide the legal documents, contracts and writings, both true and false which were essential to the conspiracy;

witz, a Jacksonville attorney, for assistance in the purchase of a restaurant in the Jacksonville area. Within a few days Abbott met Haimowitz at his law office and told him he was looking for a restaurant in the $50,000 to $100,000 price range. Haimowitz telephoned an associate who was chairman of the zoning board and requested he show Abbott some available restaurants. Abbott was shown several restaurants, including Swain's Charbroiled Steakhouse. Because Swain's was in the $300,000 to $325,000 price range, Abbott was told to recontact Haimowitz. When Abbott informed Haimowitz about Swain's, Haimowitz said he might invest in it personally and wanted to inspect the building. When Abbott protested that it was impossible for him to procure the purchase price, Haimowitz told him not to worry.

Abbott and Haimowitz inspected Swain's and returned to Haimowitz's law office. Haimowitz told Abbott that he would take 10% ownership of the restaurant and that a loan could be obtained from the SBA for the purchase and renovation. Abbott then told Haimowitz that he could not apply for an SBA loan because he previously had gone into bankruptcy and was a convicted felon for vehicular homicide. While Abbott was a convicted felon, he had not been convicted of vehicular homicide. Abbott testified on cross-examination that he had been involved in numerous criminal acts involving other false and fraudulent SBA loans, acts of arson, and trafficking in narcotics. Nevertheless, Abbott agreed to have an SBA loan "package" prepared by Robert Flude of Atlanta while Haimowitz agreed to obtain an estimate from a contractor, to draft the purchase agreement, and to obtain an equipment appraisal and an insurance breakdown.

In November, 1979, Haimowitz and Abbott met with a representative of Swain's Charbroiled Steakhouse, at which time Haimowitz negotiated the selling price of the restaurant. Abbott then obtained a loan

package from Flude, giving Flude false information about his background. In addition to the false information provided by Abbott, Haimowitz telephoned Flude and directed some changes in the information supplied by Abbott in order to make the SBA package more attractive. Abbott received the final SBA package from Flude and took it to Haimowitz's office, where Haimowitz provided the purchase agreement, appraisals of the land, building and equipment, an insurance breakdown, and an inflated estimate for the renovation work. Abbott and Haimowitz also prepared and included a fraudulent letter of recommendation and employment verification, which documents formed the basis for Counts Two and Three of the indictment against Haimowitz.

The loan proposal was submitted to several Jacksonville-area banks, including the American National Bank, where defendant Bacon was employed as a Vice-President. The American National Bank ultimately approved the loan, with Abbott as sole owner of the restaurant. Defendant Bacon had the application hand carried to the SBA office.

The SBA agreed to insure the loan if Abbott used $210,000 of his personal funds as capital injection, obtained insurance, provided a bondable contractor and architect, and had the liquor license transferred. Additionally, of the $450,000 the bank agreed to loan, $192,847 was earmarked to be spent on renovating and remodeling the restaurant. Construction funds were to be retained in escrow by the bank and money released through draws supplied by the contractor.

Various instruments prepared by Haimowitz and used to feign compliance with the loan terms formed the basis for various counts of the indictment against Haimowitz. These included (1) a forged receipt for $30,000 as down payment received for reno-

counsel, advise and oversee the general operation of the conspiracy; induce and inveigle innocent third parties to rely and act upon

the representations, pretenses, promises and documentation provided by the conspirators.

\*     \*     \*     \*     \*     \*

vation and remodeling work (Counts Five and Nine); (2) a forged receipt for $161,304 as payment received for restaurant inventory and equipment purchases (Counts Six and Eight); and (3) a forged receipt for $24,822.33 as prepaid insurance premiums (Counts Seven and Ten).

On January 4, 1980, the loan closing was held at the law offices of the attorney for American National Bank. Of the $450,000 loan, about $170,000 was disbursed to the sellers, about $75,000 was given to Abbott as working capital, and $192,847 was held by the bank in escrow for construction work.

When the original contractor could not provide the required performance bond, Haimowitz met with defendant Harold Bloom, president of Blosam Contractors, Inc., who agreed to sign a "stipulated sum" contract whereby the necessary construction work would be done for $192,847. It was agreed, however, that Blosam would do the work for $100,000, and the remainder would be kicked back to Abbott and Haimowitz. Three draws were made from the bank for the renovation work, for which Abbott would receive from the bank a check payable to Abbott and Blosam. Thereafter, Blosam paid a portion of each check to Abbott, who in turn paid a portion of the kickback to Haimowitz, to-wit: $20,000 to $25,000.

Although Haimowitz was not charged in the substantive counts based on this kickback scheme, this scheme, together with the acts involved in the scheme to obtain the SBA loan, formed the basis of the conspiracy count (Count One) against Haimowitz.

## I. DENIAL OF MOTION TO SUPPRESS

Appellant contends that prejudicial error resulted from the district court's denial of appellant's motion to suppress evidence seized from his law office. As a result of the denial, the Government introduced as evidence Haimowitz's personal files of (1) Abbott's SBA loan application; (2) the incorporation of Abbott's Restaurant; (3) various suits by creditors against Abbott; (4) Haimowitz's personal notebooks of telephone messages; and (5) copies of letters to various persons. Appellant offers five reasons for which the search warrant should have been held improperly issued.

### A. Staleness of Probable Cause

The Affidavit for Search Warrant avers that Peter Abbott stated that on or about July 22, 1980 he was in Haimowitz's office and observed a file containing many documents relating to the loan application in question herein. Judi Greenhut, a former secretary of appellant, also stated that as of June, 1980, there existed a file in Haimowitz's office containing the loan documents in question. The affidavit was signed August 21, 1980.

The appellant maintains that because there was a seven and one-half month time lapse between the loan closing on January 4, 1980 and the August 21, 1980 date of the affidavit, the information contained in the affidavit was stale.

In *United States v. Weinrich,* 586 F.2d 481 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979), the appellants, convicted on drug conspiracy charges, argued that information relied upon in a wiretap application was fatally stale. The first informant's tip was given on November 10, 1976, one hundred days prior to the application, and the second tip came on January 18, 1977, thirty days prior to the application.

In upholding the legality of the wiretap, the court noted:

> The function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate. Rather, the assay focuses on one relevant part of the determination that reasonable probable cause exists to warrant the issuance of an order to perform a wiretap or make a search. Out-of-date information as to a single transaction could be seen to describe no more than an isolated event in the past. Such an affidavit would not create probable cause to believe that similar or other improper conduct is continuing to occur.

On the other hand, information which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists for the order to intrude.

\* \* \* \* \* \*

"In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. The Circuits hold that where an affidavit recites a mere isolated violation it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance."

*Id.* at 491 (*quoting Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973)). In the present case, information regarding the presence of fraudulent documents in Haimowitz's office was as recent as one month before the affidavit was signed. Further, the nature of the offense charged and the place searched compel the conclusion that the information in the affidavit was not stale. The documents in question reasonably could lead a person to conclude that they pertained to activities the records of which were likely to be maintained in the office. *See* list *infra.* This conclusion is further supported by the statement of Haimowitz's former secretary, Judi Greenhut, who averred that the practice of the office was to maintain documents indefinitely. It was not unreasonable for the issuing magistrate to conclude that the documents were present in Haimowitz's office as of the date of the application.

### B. *Aguilar/Spinelli Challenge*

■ In order to withstand fourth amendment scrutiny, the affidavit must provide the magistrate with enough essential facts to enable him to exercise his independent judgment and perform his function as a detached and neutral magistrate. *See Spinelli v. United States,* 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

*Aguilar* devised a two-part test of the sufficiency of an affidavit based on hearsay information: first, the affidavit must provide information regarding the reliability of the information provided by the informant; second, the affidavit must provide information regarding the credibility of the informant. *See United States v. Lefkowitz,* 618 F.2d 1313, 1316 (9th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980).

■ As in *Lefkowitz,* the affidavit in question indicates that Abbott personally observed the documents in question in Haimowitz's office. The affidavit further relates events at which Abbott was himself present. This satisfied the first *Aguilar* requirement.

■ The affidavit does not set forth the fact that Abbott himself had been convicted of felonies and engaged in numerous bad acts. Nevertheless, the affidavit here contains much data that point to Abbott's credibility. The affidavit contains detailed, firsthand information that is specific in its allegations, and is therefore "self-corroborating". *Lefkowitz,* 618 F.2d at 1316 (*quoting United States v. Banks,* 539 F.2d 14, 17 (9th Cir.), *cert. denied,* 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976)). *See also Spinelli,* 393 U.S. at 417, 89 S.Ct. at 589. Some information supplied by Abbott, particularly with respect to the presence of fraudulent documents in Haimowitz's office, is corroborated in the affidavit by statements made by Judi Greenhut, Haimowitz's former secretary, whose credibility is unassailed.

We conclude that the affidavit is sufficient on its face to support the finding of probable cause made by the magistrate.

### C. *Franks v. Delaware Challenge*

Haimowitz argues that the affidavit is insufficient because the omission of facts concerning Abbott's prior felony convictions and bad acts may have led the magistrate to a misconception of Abbott's credibility.

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the court

held that in order to challenge a facially valid affidavit,[2]

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an *offer of proof.* They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* at 171, 172, 98 S.Ct. at 2684 (footnote omitted).

■ At the outset, we note that Haimowitz's motion to suppress contains nothing more than conclusory allegations, unaccompanied by any offer of proof, that by his omission[3] the affiant intended to mislead the magistrate with respect to Abbott's credibility. Appellant claimed that "the affiant signing the Affidavit for Search Warrant intentionally misled the issuing magistrate as to the reliability of the informant, Peter R. Abbott." He asserted as "inescapable" the conclusion that such must have been the intent. He argued there was not "one single averment on the affiant's part as to Peter R. Abbott's reliability, an oddity in and of itself when an affidavit for a search warrant is based on hearsay information from an informant." The reason for the affiant's deletion of this area, it is alleged, "is that affiant, an agent of the Federal Bureau of Investigation, knew Peter R. Abbott was about as unreliable a person as has ever been known." Appellant contended that the F.B.I. had had contact with the individual called Peter R. Abbott for years, and at the time of the execution of the affidavit, knew of his extensive criminal record. These were conclusory allegations, unsupported by an offer of proof.

■ Further, we conclude that even if the magistrate had known of Abbott's prior acts, the affidavit would still have supported a finding of probable cause for the reasons set forth *supra, i.e.,* the firsthand character of Abbott's statements, coupled with Judi Greenhut's corroboration.

### D. *"Mere Evidence"*

■ Appellant's fourth reason for asserting that the search warrant was illegal is that the papers were "mere evidence" of a crime, rather than instrumentalities of the crime, fruits, or contraband, and they could not be seized under *Gouled v. United States,* 255 U.S. 298, 310, 41 S.Ct. 261, 265, 65 L.Ed. 647 (1921). This distinction prohibiting seizure of items with only evidential value and allowing seizure of instrumentalities, fruits, or contraband was rejected by the Supreme Court in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18

---

**2.** In *Franks,* the high court specifically addressed the question of when a defendant is entitled to an evidentiary hearing regarding an affidavit in support of a search warrant. *Id.,* 438 U.S. at 155, 156, 98 S.Ct. at 2676. The *Franks* rationale, however, has been used to test the validity of a search warrant on appeal. *See United States v. Astroff,* 578 F.2d 133 (5th Cir.1978) (en banc). *See also Lefkowitz,* 618 F.2d at 1317. *Astroff* is binding precedent in this court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**3.** *Franks* dealt with an affirmative false statement, rather than an omission as in the present case. Because there appears no reason to differentiate between an affirmative statement and a misleading omission, we assume, without deciding, that the principles of *Franks* permits an attack on warrants allegedly deficient as a result of such an omission. *See Lefkowitz,* 464 F.Supp. 227, 233 (C.D.Cal.1979); *aff'd,* (9th Cir.) 618 F.2d 1313, 1317 n. 3.

L.Ed.2d 782 (1967). *See* Fed.R.Crim.P. 41(b) (property constituting evidence of a crime may be subject to seizure under a search warrant).

■ The appellant also argues that the admission into evidence of his papers effectively compelled him to testify against himself in violation of the fifth amendment, citing *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) and *Gouled v. United States,* 255 U.S. 298, 306, 41 S.Ct. 261, 264, 65 L.Ed. 647 (1921). The Supreme Court rejected this argument in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), holding that the search of an attorney's office for business records, their seizure, and subsequent introduction into evidence did not violate the fifth amendment. Although the records in *Andresen* contained incriminating statements the attorney had voluntarily committed to writing, he was never required to say or produce anything, and no compulsion to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was present.

### E. *General Search*

The appellant's final argument is also meritless. Appellant avers that the search warrant constituted a "general search", *see, e.g., Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), in that the documents listed in the affidavit were available either in the public records or in a collateral file maintained by the American National Bank, or the affidavit failed to show probable cause to believe that certain documents were actually in Haimowitz's office.

The warrant provided for the seizure of the following items from Haimowitz's office:

Description of Property to be seized:

1. The following items pertaining to the application of Abbott's Restaurant, Inc., also known as Abbott, Inc. and Abbott's Restaurants, Inc. for a $450,000 loan from the American National Bank of Jacksonville and for a Small Business Administration guarantee of that loan: loan applications; lists of collateral; letters on "Hotels of Distinction" stationery signed by Virginia Blasi; contracts for the purchase and sale of Swain's Steakhouse; receipts for the purchase of restaurant equipment; letters and receipts from Morris, Gordon & Sons; personal history statements of Peter Abbott; contracts and quotes for the remodeling of Swain's Steakhouse, later known as Abbott's Restaurant; letters of appraisal for the real property known as Swain's Steakhouse; Small Business Administration statements regarding preconditions to be satisfied by the borrower before the issuance of the loan; disbursement sheets; correspondence and memoranda regarding arrangements to pay money to Fred Bower of the Small Business Administration and to Fred Bacon of the American National Bank of Jacksonville in connection with approval of the loan and loan guarantee; cards in the Roledex file on the secretary's desk nearest to the door to Harold Haimowitz' personal office containing the names of officials of the Small Business Administration; correspondence and memoranda regarding arrangements to have Paul Akin do an appraisal of property located at 5800 Phillips Highway, Jacksonville, Florida; books and records showing the amount and disposition of monies paid to Harold Haimowitz by Peter Abbott; blank stationery of Hotels of Distinction and Morris, Gordon & Sons; telephone messages from Fred Bower, Fred Bacon, Harold Bloom, Peter Abbott and Paul Akin during the period from October 1979 through June 1980; books records, and documents showing or tending to show an intent to deceive and/or knowledge of false statements made to the American National Bank of Jacksonville and to Small Business Administration on the part of Harold Haimowitz, together with other fruits, instrumentalities, and evidence of crime described in the attached affidavit.

2. The black IBM Selectric typewriter with self-correcting feature which is located on the secretary's desk used by Theresa Pinson, said desk having Theresa Pinson's name plate thereon, which is located in the common office area of Suite 1001, is on the Bay Street side of the common area and is on the second secretary's desk from the end of the common area on the right hand side as determined by facing Bay Street.

Compare *Andresen, supra,* 427 U.S. at 480 n. 10, 96 S.Ct. at 2748 n. 10, wherein a similar list was held not to constitute a "general warrant". The observations of the Supreme Court in *Andresen* are particularly relevant in the case *sub judice:*

Petitioner also suggests that the specific list of the documents to be seized constitutes a "general" warrant. We disagree. Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's false-pretense scheme with respect to Lot 13T could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession. The specificity with which the documents are named here contrasts sharply with the absence of particularity in *Berger v. New York,* 388 U.S. 41, 58–59 [87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040] (1967), where a state eavesdropping statute which authorized eavesdropping "without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described," was invalidated.

*Id.*

■ The warrant in question narrowed and identified the documents subject to seizure, thereby minimizing the danger of a random search. It also identified with adequate particularity the conspiracy under investigation. *See United States v. Bithoney,* 631 F.2d 1, 2 (1st Cir.1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981).

■ The court finds no merit to appellant's argument that the fact that the documents sought were available from other sources renders the warrant an impermissible general search. General warrants, allowing "a general, exploratory rummaging in a person's belongings," are prohibited by the requirement of a " 'particular description' of the things to be seized." *Andresen,* 427 U.S. at 480, 96 S.Ct. at 2748 (*quoting Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). This requirement was met in the present case. There is no allegation of general rummaging in Haimowitz's office outside the scope of the warrant's authorization. The specificity present in the description of property to be seized obviated the problem of a general search. *See Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965) (The specificity requirement " 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another.... [N]othing is left to the discretion of the officer executing the warrant.' ") (*quoting Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)), *quoted in Andresen,* 427 U.S. at 480, 96 S.Ct. at 2748.

## II. RESTRICTION OF CROSS–EXAMINATION

Appellant next complains that his right to confrontation, U.S. Const. amend. VI, was violated when the district court limited his cross-examination of witness Abbott. In particular, appellant sought to impeach Abbott's credibility with respect to his testimony that Haimowitz had instigated many of the illegal acts, by demonstrating that Abbott had previously engaged in the execution of fraudulent documents in Huntsville, Alabama, involving a lawyer and his secretary. Appellant also complains that

efforts to cross-examine Abbott on matters relating to (1) the source of monies invested in the restaurant venture, (2) prior fraudulent bank loans involving Abbott, and (3) governmental protection of Abbott's assets from judgment creditors were either prohibited or severely limited by the district court.

Serious restrictions of a defendant's right to cross-examine a witness can eviscerate the defendant's sixth amendment right to confront adverse witnesses and compel the reversal of a conviction. *United States v. Berkowitz,* 662 F.2d 1127, 1138 (5th Cir.1981) (*citing Davis v. Alaska,* 415 U.S. 308, 315–18, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974)). Although the extent of cross-examination on an appropriate subject is within the sound discretion of the trial court and will not be disturbed on review unless there is abuse of such discretion, there is "a sphere which a trial judge may not impinge, for the 'discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment.'" *United States v. Tolliver,* 665 F.2d 1005, 1008 (11th Cir.) (*quoting United States v. Elliott,* 571 F.2d 880, 908 (5th Cir.), *cert. denied sub nom. Hawkins v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).

We have carefully examined the record and conclude that the district court gave the appellant ample opportunity to cross-examine Abbott and expose facts from which the jury could draw fair inferences regarding Abbott's credibility. The district court limited detailed excursions into collateral matters; this was a proper exercise of the district court's discretion and did not deprive the defendant of his rights to confrontation. *See United States v. Cohen,* 631 F.2d 1223, 1226 (5th Cir.1980). The appellant was able to achieve his desired purpose of impeaching Abbott's testimony despite specific restrictions placed on his cross-examination by the trial court.[4] *See United States v. Lewis,* 676 F.2d 508, 512 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 313, 74 S.Ct. 291 (1982). Appellant's claim that the trial court "constant[ly] limit[ed]" his cross-examination of Abbott is not supported by the record.

### III. DENIAL OF SURREBUTTAL

Appellant's third specification of error is that the district court committed prejudicial error in refusing to allow the defendant the opportunity to find and present good character witnesses in surrebuttal to counter the character testimony of two listed government witnesses presented in rebuttal.

Appellant had taken the witness stand to deny the allegations of his involvement in the loan scheme. The government called

---

4. As a result of the district court's evidentiary rulings, the jury was given ample information from which to draw inferences regarding Abbott's reliability. The jury knew Abbott's testimony was given under an agreement with the government whereby Abbott was to plead guilty to a single count in a related case in return for freedom from prosecution on any of the offenses arising out of the present case. The jury was also aware that Abbott's sentencing on the guilty plea had been continued, and that the sentencing judge would be advised of his cooperation with the government.

With regard to prior offenses, the jury was informed that Abbott had eight criminal convictions in Boston, Massachusetts and one criminal conviction in Jacksonville, Florida. In addition to convictions, the jury knew that Abbott had been the middleman in a Boston cocaine transaction, had had an automobile burned in Boston, and had received other fraudulent bank loans, which were repaid out of insurance funds following fraudulent arson, in Boston.

The jury was also cognizant of the details of Abbott's involvement in governmental immunity programs. The jury knew that Abbott received immunity in Boston for all crimes he disclosed to authorities, that at the time of trial he was being paid $1,300 per month and had been paid $11,000 during the previous 10–11 months by the government, and that he had been relocated by the government under an assumed name. The jury was also aware that the government would attempt to place Abbott on the Witness Protection Program for his assistance in this case, wherein during a previous tenure Abbott had received $29,000 from the government.

two witnesses in rebuttal, Herbert Kanning, a Jacksonville attorney who had known the appellant for ten years, and Thomas D. Treece, a Jacksonville attorney who had previously been a law partner of the appellant. Both witnesses testified adversely to the appellant's reputation in the community for truth and veracity and as to their own opinion regarding the appellant's credibility.

After the government closed, there was a side bar conference regarding procedural matters unrelated to this appeal. The district judge then informed the jury that the presentation of testimony and evidence had concluded, and dismissed them until the next morning. The defendant's attorney then stated that he would like to have "some time to locate at the most two witnesses to testify" regarding the defendant's credibility. The district court agreed with the prosecution that surrebuttal was within the discretion of the court, and denied the request, further noting that "the Court having announced that the testimony and evidence had been concluded would perhaps attach undue significance to that presentation."

■ "Although a criminal defendant cannot be compelled to take the stand in his own defense, once he chooses to testify 'he places his credibility in issue as does any other witness.'" *United States v. Lollar,* 606 F.2d 587, 588 (5th Cir.1979) (citations omitted). Thus, the district court correctly allowed the government to call witnesses to testify that the defendant's reputation for truth and veracity were bad and as to their own opinion regarding the defendant's credibility. *Id.* at 588, 589.

■ Whether or not to allow evidence in surrebuttal is a matter within the sound discretion of the district court; the district court's decision not to allow surrebuttal may not be disturbed unless such discretion was abused. *See, e.g., United States v. Sadler,* 488 F.2d 434, 435 (5th Cir.) (per curiam), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974). In the present case, the trial court properly limited the rebuttal witnesses' testimony to the de-

fendant's reputation and the witnesses' opinions regarding his truth and veracity. This prevented the government from introducing new matters that may have prompted the need for surrebuttal on behalf of the defense. *See id.* Because the issue of the defendant's truthfulness was placed in issue upon his testimony, the government injected no new issue, and there was no abuse of the trial court's discretion to deny surrebuttal.

## IV. SINGLE v. MULTIPLE CONSPIRACIES

■ Appellant's final contention is that the district court erred in failing to grant appellant's motion to dismiss Count One for duplicity. *See generally Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Appellant specifically urges that the "first" conspiracy concerned the acts leading to the obtaining of the SBA loan, the "second" relating to the acts surrounding the subsequent use of the proceeds.

The Fifth Circuit has consistently held that a single conspiracy may exist "even though the agreement that constitutes it has several objectives and aims at the commission of several offenses." *United States v. Rodriquez,* 585 F.2d 1234, 1249 (5th Cir. 1978) (*citing United States v. Elliott,* 571 F.2d 880 (5th Cir.1978)), *aff'd on rehearing,* 612 F.2d 906 (5th Cir.) (en banc), *cert. denied sub nom. Albernaz v. United States,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). An examination of the indictment reveals the true character of the conspiracy charged herein. The acts alleged leading up to the obtaining of the loan were the necessary precursors to the acts performed to reduce the loan monies to possession. The indictment charges only one overall conspiracy in which Haimowitz was involved at each stage.

AFFIRMED.