NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0023n.06
Filed: October 13, 2004
No. 03-1651

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | On Appeal from the United States |
| ) | District Court for the Eastern |
| PAUL SUMMERS CHAPMAN, ) | District of Michigan |
| ) | |
| Defendant-Appellant. ) | |

Before:     **BOGGS, Chief Judge; DAUGHTREY, Circuit Judge; and WISEMAN, District Judge.**[*]

**BOGGS, Chief Judge.**  Defendant Paul Chapman was convicted by a federal jury on drug-trafficking and firearm charges.  He appeals, claiming that 1) the physical evidence against him was discovered using a search warrant issued based on an affidavit that did not establish probable cause; 2) his written confession was given involuntarily; and 3) the district court improperly denied his motion to discover the identity of a confidential informant.  Because we find that these contentions lack merit, we uphold Chapman's conviction.[1]

_____

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

[1]The parties also submitted supplemental briefs as to the constitutionality of the United States Sentencing Guidelines as applied to Chapman's sentence in light of the recent decision *Blakely v. Washington*, 124 S.Ct. 2531 (2004).  Since that time, the en banc Sixth Circuit has determined that the Sentencing Guidelines withstand a *Blakely* challenge.  *United States v. Koch*, No. 02-6278 (6th Cir. August 13, 2004) (order in advance of published opinion).  Therefore, Chapman's *Blakely*

No. 03-1651

# I

On October 1, 2001, ATF Agent John Hoffman sought a search warrant for Chapman's residence in eastern Detroit, Michigan, from a federal magistrate judge. To establish probable cause to search for narcotics and weapons there, Hoffman submitted an affidavit stating in relevant part:

On September 25, 2001, a confidential informant claimed to have seen Chapman, a felon, in possession of an assault rifle at Chapman's residence in December 2000.

The informant also claimed to have seen Chapman distributing narcotics while armed with a handgun elsewhere in the east side of Detroit in late August 2001.

This same informant had previously provided accurate information to the ATF leading to the seizure of handguns and cocaine.

Chapman had been jailed six times in Michigan for weapons and drug offenses.

Hoffman had searched through curbside rubbish from Chapman's residence, and found silver duct-tape packaging, which Hoffman knew from his law-enforcement experience was commonly used to package narcotics.

A Detroit police canine officer's dog had indicated the presence of drugs in a file cabinet containing Chapman's discarded duct tape.

Based on this affidavit, the magistrate judge issued a search warrant.

When ATF agents arrived at Chapman's residence with the warrant, they found Chapman outside. ATF Agent Jakubowski testified that he served the search warrant, handcuffed Chapman,

---

arguments fail.

and read him his *Miranda* rights. Chapman testified that he was not read his *Miranda* rights at this time. Moreover, he claims that he was befuddled and intimidated because he had just taken heroin.

The agents searched the house and interviewed Chapman. Later, after reading his Miranda rights again, the agents took signed statement summarizing his admissions, including that he had two handguns and an assault rifle in his bedroom, and heroin, cocaine, and $25,000 cash in a safe. The agents found all of these items where Chapman had said they would be.

Chapman was arrested, indicted, tried, and convicted of being a felon in possession of a firearm, and of possession of cocaine, heroin, and marijuana with intent to distribute, in violation of 18 U.S.C. § 922(g) and 21 U.S.C. § 841(a)(1). During these proceedings, the district court denied his motion to suppress the results of the October 1, 2001 search, and denied his motion to discover the identity of the confidential informant described in Hoffman's affidavit.

**II**

A court reviews a magistrate's issuance of a search warrant with deference, suppressing the resulting evidence only if the magistrate's finding of probable cause was arbitrary. *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001). We review the district court's determination of probable cause at a suppression hearing de novo as to legal conclusions and for clear error as to findings of fact. *United States v. Smith*, 182 F.3d 473, 476 (6th Cir. 1999). We consider the affidavit upon which the warrant was based in a "commonsense" manner, asking whether, in view

of the totality of the circumstances, there was a "fair probability" that contraband would be found. *Id.* at 479 (quoting *United States v. Davidson*, 926 F.2d 856, 859 (6th Cir. 1991)).

Part of the totality of circumstances to be considered as to an affidavit's sufficiency is an informant's "veracity, reliability and basis of knowledge." *United States v. Allen*, 211 F.3d 970, 972 (6th Cir. 2000)(en banc)(quoting *Illinois v. Gates*, 462 U.S. 213 (1983))(internal quotations omitted). When an affidavit lacks any indicia of the sole informant's reliability, the police must corroborate the informant's eyewitness report. *Id.* at 976. Here, however, the affidavit specifically sets forth that the informant had previously provided the ATF with accurate and productive information. The magistrate judge could correctly consider the informant reliable. *Id.* at 975.

This does not end our inquiry, because the eyewitness information provided by the confidential informant was rather thin: he had seen an assault weapon in Chapman's home nine months before, and eight months later had seen Chapman dealing drugs on the streets of the same city with a different gun. The issue is whether these allegations warrant a belief that a search of Chapman's home had a "fair probability" of revealing weapons and/or drugs. *Gates*, 462 U.S. at 238.

To determine whether probable-cause evidence is stale, a court considers the defendant's course of conduct, the nature and duration of the crime, the nature of the evidence, and more recent corroboration. For example, information two years old is not stale as regards a long-term and non-portable enterprise like growing marijuana, but a two-month old sighting of retail-narcotics cash proceeds is stale where the affidavit does not indicate that the defendant was engaged in a long-term criminal enterprise. *Compare United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998), *with*

*United States v. Helton*, 314 F.3d 812, 822 (6th Cir. 2003). Of particular relevance here is that at least one of the items to be sought was "of enduring utility" to the owner. *Spikes*, 158 F.3d at 923 (quoting *Andresen v. State*, 331 A.2d 78, 106 (Md. Ct. App. 1976)).

Agent Hoffman noted in his affidavit that, based on his training and experience, firearms are often used by narcotics traffickers for protection, and people generally store their firearms at home. As a repeat drug dealer known to have continued or returned to his trade the month before the warrant issued, Chapman would find a firearm, especially a powerful assault weapon, useful over the long term, and thus could reasonably be expected to have held on to it at his home for nine months. *See United States v. Singer*, 943 F.2d 758, 763 (7th Cir. 1991) ("firearms are an integral part of the drug trade"); *United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999) (people tend to keep their guns at home); *United States v. Batchelder*, 824 F.2d 563, 564 (7th Cir. 1987) (reasonable to expect gun silencers were kept for eleven months).

The Government urges that the informant's two sightings also justify a search for drugs at Chapman's house because they show a "chain of related events covering a broad span of time into the current period." *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988) (quoting *United States v. Haimowitz*, 706 F.2d 1549, 1554-55 (11th Cir. 1983). But where *Henson* involved an odometer-shifting scheme that required several discrete steps over months, Chapman was seen engaged in street-level, retail drug-trafficking — a notoriously fly-by-night, portable trade. And, unlike guns, drugs are perishable and are disposed of quickly. Moreover, nothing in the affidavit indicates that a street-level, retail drug trafficker is especially likely to keep his stock in his own

residence. That Chapman kept a gun in his house in December does not imply that he kept drugs there the next September. A search for drugs at his house could be justified only by the dog sniff.

## III

The problem with the dog sniff as evidence is that the affidavit does not give explicit reasons to negate questions as to the reliability of either the dog or the file-cabinet test protocol. An indication by a well-trained dog establishes probable cause for a narcotics search, but the affidavit must show that the dog is trained and reliable in detecting narcotics. *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996). Dogs cannot sniff out narcotics without special training, which not all police dogs receive. Some dogs are trained to detect explosives or accident victims, or to help spot and detain suspects. Police officers who are not canine handlers are not always aware of the difference. The bare statement that the dog is trained and used in narcotics detection is enough, *ibid.*, but the affidavit here says only that the dog was a Canine Officer's dog. This is not enough to establish the dog's reliability.

Moreover, the affidavit says only that the file cabinet "contained the duct tape packaging" from Chapman's trash. Even a well-trained narcotics-detection dog might alert to a file cabinet that, for example, held another suspect's leavings as well, or had been used for cocaine storage the week before. It would have been helpful for Agent Hoffman to explain why the duct tape was in a file cabinet. Perhaps this was part of a well-established protocol used by the ATF, or the Michigan state

police, or Agent Hoffman, to shield properly-isolated, suspect materials from a trained canine's sight and ensure the integrity of the test. Then again, perhaps not.

Because Chapman failed to raise these issues at the suppression hearing, they are forfeited. *United States v. Critton*, 43 F.3d 1089, 1093 (6th Cir. 1995). This court may in its discretion reverse based on a forfeited issue for plain error under Federal Rule of Criminal Procedure 52(b). *United States v. Olano*, 507 U.S. 725, 734 (1993). But we reverse only to avoid "a miscarriage of justice," i.e., "an error that may seriously affect the fairness, integrity, or reputation of judicial proceedings." *Ibid.* (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

Although it is clear that Agent Hoffman's affidavit failed to pass muster at least by not indicating the police dog's reliability, we need not decide at this time whether issuance of the warrant amounted to plain error. Even assuming plain error, the search was justified under the "good faith" exception to the warrant requirement. *United States v. Leon*, 468 U.S. 897, 922 (1984) (evidence shall not be suppressed where officer's reliance on facially valid warrant was objectively reasonable). This exception applies unless the warrant is based on a knowingly or recklessly made falsehood in the affidavit, the affidavit is obviously insufficient on its face, the magistrate acts as a mere rubber stamp, or the warrant is facially deficient. *United States v. Savoca*, 761 F.2d 292, 296 (6th Cir. 1985). Neither Chapman nor the record suggests that Agent Hoffman recklessly or deliberately misled the magistrate judge. Chapman urges that Hoffman's affidavit was so patently insufficient that the investigating agents' reliance upon the warrant was "entirely unreasonable." *Leon*, 468 U.S. at 923. But the flaws in the warrant affidavit were not so obvious as to be apparent to the average law-enforcement agent. In the absence of any indication of deceit or chicanery, and

none is offered, the defects amounted to mere drafting deficiencies not obviously within the agent's expertise. *See Savoca*, 761 F.2d at 296-98 (*Leon* rule applies where affidavit failed to state that robbery was recent so as to permit inference that defendant stashed loot at hotel room to be searched) . Therefore, the evidence obtained as a result of the warrant was properly admitted at Chapman's trial.

**IV**

Chapman argues that his confession was involuntary because he was under the influence of heroin and because he was not given *Miranda* warnings before he was first interrogated. The Government need prove only by a preponderance of the evidence that a confession was voluntary. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992). We review the district court's factual findings for clear error and its legal conclusions de novo. *Id.* at 411.

Chapman does not argue that the police coerced him in any way, only that his heroin-befuddled state made him unduly frightened of them. But "coercive police activity is a necessary predicate to the finding that a confession was not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 515, 522 (1986). As to his *Miranda* warnings, the district court found at the suppression hearing that Chapman was in fact given *Miranda* warnings before his initial interrogation. This finding was based primarily on the finding that ATF Agent Jakubowski was more credible than Chapman. That finding, in turn, was based on Chapman's story that he took heroin while he knew a law-enforcement agent was closely following him, and on his story that the ATF agents concocted a richly-detailed,

fake confession for his signature in a very short time. These findings were not clearly erroneous. The district court's decision stands.

## V

Finally, we review the district court's denial of Chapman's motion to reveal the confidential informant's identity for abuse of discretion. *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992). The district court weighs the public's interest in maintaining the availability of confidential informants against the accused's need for the information, ordering disclosure only upon a showing that it is essential for a fair trial. *Ibid.* Chapman's requested the informant's identity solely on the ground that the information might help him discredit the informant and thus suppress the information obtained as a result of the warrant. But because the warrant is facially valid, Chapman would have to show not merely that the informant was not credible, but also that Agent Hoffman knowingly or recklessly included in the affidavit false information obtained from the informant. *Savoca*, 751 F.2d at 296. Chapman gives no reason to think it is likely that he could make such a showing, he merely asks for permission to begin a fishing expedition. His reasoning would apply in any case where confidential informants were used, thus ending the practice of maintaining confidentiality, to the public detriment. The district court did not abuse its discretion in denying Chapman's motion.

## VI

For the foregoing reasons, we AFFIRM the judgment of the district court.

No. 03-1651

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting. Since 1791, judges, lawyers, prosecutors, and citizens have, for the most part, revered and respected the Fourth Amendment's recognition of the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and its mandate that "no Warrants shall issue, but upon probable cause." Over the past three or four decades, however, some courts have carved exceptions to the ideals of those provisions, and we, as a nation, have been increasingly content to accept those restrictions on hallowed rights -- in exchange for purported security against possible harm from illegal drugs, guns, terrorists, and various imagined threats. Today, the majority chips away yet another chunk from one of our constitutional bulwarks against tyranny. I decline to join in this erosion and therefore dissent.

The cornerstone of the Fourth Amendment's warrant requirement is establishment of the probable cause necessary to authorize an invasion of a person's home or possessions. As noted by the majority, we review a district court's determination of such probable cause de novo and "consider the affidavit upon which the warrant was based in a 'commonsense' manner, asking whether, in view of the totality of the circumstances, there was a 'fair probability' that contraband would be found." *Citing United States v. Smith*, 182 F.3d 473, 476 (6th Cir. 1999); *United States v. Davidson*, 926 F.2d 856, 859 (6th Cir. 1991)).

In light of these principles, I would have thought that the majority's listing of the "strong points" of Agent Hoffman's affidavit in this matter would have been sufficient to establish the gross

inadequacy of that sworn document. Viewed even in the most positive light the majority could shine upon it, the affidavit presented to the magistrate judge to justify entry into a citizen's home stated only that Chapman, a convicted drug and weapon offender, had been seen with a rifle in his home *nine to ten months* earlier; that Chapman had been seen with a handgun away from his home *one month* earlier while distributing narcotics; that Chapman had duct tape in his trash; and that a police dog had alerted to a police department file cabinet drawer where the recovered duct tape was stored.

It is somewhat reassuring that the majority recognizes the inherent problems in relying upon the evidence of prior drug sales and of this police-dog sniff to buttress the warrant request. As noted in the lead opinion, "nothing in the affidavit indicates that a street-level, retail drug trafficker is especially likely to keep his stock in his own residence. That Chapman kept a gun in his house in December does not imply that he kept drugs there the next September."[1] Majority Opinion at 5. Additionally, "the affidavit says only that the file cabinet 'contained the duct tape packaging' from Chapman's trash. Even a well-trained narcotics-detection dog might alert to a file cabinet that, for example, held another suspect's leavings as well, or had been used for cocaine storage the week before." Majority Opinion at 6.[2]

Unfortunately, the majority fails to subject the statements offered in Agent Hoffman's affidavit regarding Chapman's possession of *firearms* to the same level of critical examination.

---

[1]Although Agent Hoffman spoke with his confidential informant on September 25, 2001, Hoffman did not seek or execute the search warrant until October.

[2]Presumably, the majority also would grant little, if any, weight to the fact that duct tape was found in Chapman's trash, even though duct tape is sometimes used to wrap narcotics. After all, duct tape is an innocent and extremely common item; the Department of Homeland Security has even advised that we all purchase duct tape and sheets of plastic to protect ourselves from our nation's enemies.

Indeed, to allow for the possibility that this information was anything other than stale is to denigrate the very principles upon which the Fourth Amendment is founded. To contend that it is "probable," not merely "possible," that the defendant had a firearm in his home in October 2001 simply because one was seen there the previous December is unreasonable. To assert that Chapman's August possession, in a different location, of a completely different type of firearm, means that the gun would be found in the defendant's home in October is equally idle speculation.

The majority attempts to support its position by citing to our decision in *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998), and arguing "that at least one of the items to be sought in the search was 'of enduring utility' to the owner." Majority Opinion at 4-5. This citation, however, merely underscores the fallacy of the majority's legal conclusion. The "enduring utility" of any firearm to Chapman is suspect given the fact that the confidential informant and the affiant were unable to offer *any* evidence of *any* connection between the defendant's residence and *any* firearm in the ten months prior to the application for a warrant. Even the one time Chapman was seen with a gun in that interval, the observation was of the defendant, away from his home, with a handgun, not with the rifle that the informant had seen previously. Such drastically differing scenarios show that Chapman, unlike the defendant in *Spikes*, did not demonstrate an ongoing pattern of criminal activity *associated with the location to be searched*.

The obvious weaknesses in the affiant's attempt to establish probable cause to search the defendant's home necessarily leads the majority to erect *Leon*'s "good faith" safety net in an effort to preserve the conviction rendered. *See United States v. Leon*, 468 U.S. 897 (1984). In doing so,

the majority implicitly recognizes the deficiencies in Agent Hoffman's efforts to establish probable cause to search the home, but then states -- patronizingly, in my judgment -- that "the flaws in the warrant affidavit were not so obvious as to be apparent to the average law-enforcement agent." Majority Opinion at 7. I would attribute greater constitutional sophistication to the women and men to whom we entrust our safety and security. Rather than relegate our expectations of police conduct to the lowest common denominator, I believe that the citizenry should expect law enforcement officials to understand basic constitutional principles forbidding invasions of personal privacy on mere conjecture, stale information, and evidence unrelated to the location to be searched.

A reasonable law enforcement official should have been aware of the glaring shortcomings in the affidavit presented to the magistrate judge in this case. To hold otherwise ratifies a probable cause level so low that no citizen, law-abiding or not, would be protected from fishing expeditions for information contained on his or her person or in his or her home, papers, and effects. Rather than join a decision that erodes fundamental Fourth Amendment values, I dissent from the majority's analysis and conclusion that the Supreme Court's holding in *Leon* allows the introduction into evidence of the fruits of this illegal search.