**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**J. Clenton HENSON (87–5132); Sheila Henson Lutz (87–5138); & C. Alan Henson (87–5144), Defendants–Appellants.**

Nos. 87–5132, 87–5138, 87–5144.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 11, 1987.

Decided June 15, 1988.

Rehearing Denied in Nos. 87–5132, 87–5138 July 28, 1988.

Thomas L. Osborne (argued), Paducah, Ky., for J. Clenton Henson.

Gary R. Haverstock (argued), Murray, Ky., for Sheila Henson Lutz.

Roger William Perry (argued), Long and Perry, Benton, Ky., for C. Alan Henson.

Joseph Whittle, U.S. Atty., Louisville, Ky., David Grise (argued), Terry M. Cushing, for U.S.

Before NELSON and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

BOGGS, Circuit Judge.

J. Clenton Henson and Sheila Henson Lutz, his daughter, were convicted by a jury of one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371 (1982). Clenton Henson was also found guilty of six counts of giving, or causing a transferor to give, a false odometer statement to a transferee of an automobile, in violation of 15 U.S.C. §§ 1988(b) and 1990c (1982). C. Alan Henson, Clenton's son, pled guilty to the conspiracy charge and to one count of mail fraud, in violation of 18 U.S.C. §§ 2 and 1341 (1982). Finding no merit to the contentions raised on appeal, we affirm the convictions and the sentences.

I

We will briefly review the pertinent facts, supplementing our discussion as we consider the various contentions raised. We, of course, view the evidence in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The government must be given the benefit of all inferences which can reasonably be drawn from the evidence. *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir.1984) (and cases cited therein), *cert. denied sub nom. Freeman v. United States*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985).

The government presented evidence that the defendants, Clenton Henson, Sheila Lutz and Alan Henson, were involved in an extensive odometer-tampering scheme. Clenton Henson, Ralph Lutz (Clenton's son-in-law) and others associated with the Henson organization purchased large numbers of late-model, high-mileage automobiles in California, Indiana, Missouri and Tennessee, using such names as Dennis Used Cars, Gary Ray's Used Cars and Ron Walston Auto Sales. Ralph Lutz testified that although these names represented real dealers, none of them had any connection with the automobiles bought in their names. The money used to purchase these vehicles came from accounts in these dealers' names, which Sheila Lutz had established at the Bank of Marshall County, but the Hensons owned and controlled the funds therein.

The Hensons purchased used cars with "sight drafts." Richard Guyer, general manager of the Auto Dealers Exchange in Indianapolis, Indiana, explained the sight draft process as follows:

> Purchases by sight draft [are] just another form of payment for a vehicle. The sight draft, by definition, is an envelope-type form that has basic information and spaces on the front, description of the vehicle, the price paid for the vehicle. It's signed much as a check is. Being in the form of an envelope for payment, the auction must take a transferral statement, title and odometer statement, ... insert them in the draft and they are forwarded to the purchaser's bank for subsequent payment.

According to Guyer, the sight drafts would be sent by mail from the auction to the purchaser's bank.

When the Hensons purchased automobiles at auction, the sight drafts would be sent to the Hensons' bank, the Bank of Marshall County, for payment. Edna Collins, a bank employee who dealt extensively with the Hensons, testified that when the sight drafts arrived, she would call Sheila Lutz or one of her co-workers (Carol Lindsey or Sheila Tinsley) to verify the draft. According to Collins, they would

open the drafts and make sure that the title and everything is correct. And then whenever they okay the draft they either pay me by check or pick up the draft, or sometimes they would bring several checks in all from auto auctions, to pay them and I in turn would issue a cashier's check and mail back to the bank that I got the drafts from.

Sheila Lutz handled the sight drafts for Gary Ray's Used Cars, Ron Walston Auto Sales and other dealers, but Collins understood that the funds drawn on these dealers' accounts belonged to Clenton Henson.

Clenton Henson was in the business of financing automobiles, and the vehicles he purchased at auction were available to local automobile dealers for possible resale to the public. Clenton charged these dealers two types of fees. The financing fee cost $50 and was required of dealers who could not afford to pay for an automobile in full. The false odometer fee, which was an additional $50 or $100, entitled the dealer to a false odometer statement. Charles Haley, a wholesale automobile dealer, testified that he would often pay an extra $50 for a false odometer statement. Haley would write on his financing check the number of miles he wanted on the automobile odometer and Sheila Lutz would copy that number on the odometer statement.[1]

Clenton Henson asked Ralph Lutz to alter an odometer on one occasion, but mostly Joey Galloway did the dirty work. Galloway testified that Alan Henson and Ralph Lutz would call and tell him what mileage to put on each car. Galloway would receive $10 for his labors.

The Hensons used a variety of methods to conceal the rollback scheme. One such method was to alter the original title certificates, which reflected the accurate mileage. On some occasions, the defendants erased or typed over the mileage printed on the title documents. Ralph Lutz testified that he saw both Alan Henson and Sheila Lutz slicing the mileage off California titles.

The Hensons would also conceal the scheme by transferring vehicle ownership from one dealer (usually a coconspirator) to another. This method required the fabrication of title certificates, bills of sales, and odometer statements. The Hensons kept a stack of signed, blank odometer statements for this purpose. Sheila Tinsley, a part-time secretary for the Hensons, testified that she saw Sheila Lutz and Alan Henson forge dealers' names on bills of sale, odometer statements, automobile titles and registration forms. She admitted writing false bills of sale, signing the names of Ron Walston and Gary Ray. She also filled out false odometer statements, using such dealers' names as Bud Swink, Charlie Aldridge, Gary Ray, Ron Walston and others, and occasionally forged the name of a notary public. Carol Lindsey, another secretary for the Hensons, made similar comments. At the behest of Alan Henson and Sheila Lutz, she filled out false odometer statements, title certificates and bills of sale.

When document alterations were not feasible, the Hensons would obtain a new title certificate (from Nevada or Mississippi) through a Tennessee company called APCO Leasing. According to Sheila Tinsley, the Hensons would pay APCO Leasing to "get the miles off the title." She would use Alan Henson's checking account to pay APCO Leasing, even though the cars were in the names of Dennis Used Cars, Ron Walston Auto Sales and others. Ron Walston stated that when he wanted a title "washed" through APCO Leasing, Alan Henson and Sheila Lutz would do it for him.

In order to provide legitimacy to their scheme, the Hensons enlisted the unwitting assistance of the Marshall County Sheriff's Office. Under Kentucky law, a car dealer can pay the local sheriff's office to verify the vehicle identification number (VIN) and the odometer reading. The sheriff issues an inspection slip after comparing the VIN

---

1. Haley also testified that, although the automobiles purchased from the Hensons would be in the name of "Gary Ray's Used Cars" or "Dennis Used Cars," he neither paid nor personally dealt with Gary Ray or Dennis Henson.

and the mileage listed on the title certificate with those of the car.

The Hensons requested hundreds of inspections between 1983 and 1984. Either Clenton Henson, Alan Henson or Sheila Lutz would tell the sheriff's deputies which cars to inspect. They would request that the inspection slips be issued in the names of Dennis Used Cars, Gary Ray's Used Cars or Ron Walston Auto Sales.

Despite the simplicity of the inspection process, deputies were often told that automobiles were not ready for inspection. Deputy Bill Bryant testified that he remembered being told that certain cars were not ready for inspection, even though he was in the process of examining the documents, because the titles had not yet come in the mail. In those instances where he was asked to inspect the vehicle later, he found "a discrepancy" in the mileage reading from the time he first viewed the vehicle.

On May 22, 1985, federal and state law enforcement officials executed a search warrant at the Hensons' business address on East Fourth Street in Benton, Kentucky. Postal Inspector Joe Edwards's affidavit supported the warrant. In executing the search warrant, the officers seized automobile title documents, blank odometer statements, record books, checkbooks, other papers and computer equipment.

On March 4, 1986, the defendants were indicted along with three others, Dennis Henson, Gary Ray and Ralph Lutz.[2] Count one charged a conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; counts two through six charged mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; and counts seven through sixteen charged Clenton Henson with giving, or causing a transferor to give, a false odometer statement in violation of 15 U.S.C. §§ 1988(b) and 1990c.

Before trial, Alan Henson pled guilty to the conspiracy count and a substantive mail fraud count. He was tried on the remaining charges. Clenton Henson and Sheila Lutz pled not guilty to all counts. On

January 1, 1987, the jury convicted Clenton Henson and Sheila Lutz of conspiracy to commit mail fraud. Clenton Henson was also convicted of six counts of giving, or causing a transferor to give, a false odometer statement. Alan Henson was acquitted of the charges he faced at trial.

The district court, in addition to imposing prison terms, fined Alan Henson $20,000 and Clenton Henson $120,000 on count one of the indictment, under the Criminal Fine Enforcement Act of 1984, Pub.L. 98–596, 98 Stat. 3137, codified at 18 U.S.C.A. § 3623.

## II

Clenton Henson and Sheila Lutz challenge their convictions on count one of the indictment, which charged a conspiracy to commit mail fraud. The mail fraud statute prohibits the use of the mails "for the purpose of executing" a scheme to defraud. 18 U.S.C. § 1341. As we noted in *United States v. Castile*, 795 F.2d 1273, 1277–78 (6th Cir.1986), a conviction for mail fraud requires proof of three elements: 1) a scheme to defraud 2) which involves a use of the mails 3) for the purpose of executing the scheme.

■ At issue in this appeal is the third element: whether the use of the mails was "for the purpose of executing" the defendants' odometer-tampering scheme. *Castile* teaches that to meet this standard, the mailings need not be essential to the scheme, but must be " 'sufficiently closely related to [the] scheme.' " *Id.* at 1278 (quoting *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974)). In other words, "for a mailing to be in furtherance of a scheme, the scheme's completion or the prevention of its detection must have depended in some way on the charged mailing." *Ibid.* (and cases cited therein).

■ It is also clear that the mailings need not be "false" to be in furtherance of

---

**2.** Dennis Henson and Gary Ray pled guilty to conspiracy to commit mail fraud and to one substantive mail fraud count. Ralph Lutz pled

guilty to the conspiracy charge and five counts of mail fraud.

a scheme to defraud. *United States v. Benny*, 786 F.2d 1410, 1420 (9th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). The mailings may be innocuous by nature, but they may still support a mail fraud conviction if they are an "expectable part of a larger scheme." *United States v. Green*, 786 F.2d 247, 249 (7th Cir.1986). *See also ibid.* (the statute applies if the mailing is "a step in the plot"). "The causal connection between the mailing and the success of the scheme, not the knavery in the mailings, is what matters." *Ibid.*

■ The defendants argue that the "routine business mailings" in this case, the sight drafts, took place before any fraudulent acts occurred; that is, before the dealers decided to roll back the odometers. Since the only mailings in this case were simply for the purpose of purchasing used cars, and not for selling used cars with rolled-back odometers and false odometer statements, the mailings were not in furtherance of the scheme to defraud; nor were they an integral part of the execution of the scheme. As Clenton Henson summarizes, "[a]t the time the vehicles were purchased there was no evidence of fraudulent intent to roll back odometers. Accordingly, at the time the U.S. Mail was used for the purchase of vehicles, no fraudulent scheme was operating."

In assessing this argument, it is important to consider the mailings at issue in this case. As noted, the Hensons purchased used cars at several auctions under the guise of various dealers' names: Gary Ray's Used Cars, Ron Walston Auto Sales and others. When a vehicle was purchased, a sight draft, containing pertinent documents, would be sent by mail from the auction dealer's bank to the Hensons' bank, the Bank of Marshall County. Edna Collins, a bank employee, testified that when the sight drafts arrived, she would notify Sheila Lutz or her co-workers, who would come to the bank to verify the draft. Once Collins received authorization to pay the draft, she would usually send a cashier's check by mail to the auction dealer's bank.

The defendants' contention presupposes that the automobiles were purchased first, and the fraudulent activity occurred thereafter without their involvement or knowledge. However, the government alleged, and the record supports the finding, that the Hensons were involved in an ongoing odometer-tampering scheme throughout 1983, 1984 and during the early part of 1985. *See United States v. Galloway*, 664 F.2d 161, 164–65 (7th Cir.1981), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). Because this ongoing scheme required a continuous supply of used cars, which were procured through the mailings at issue in this case, the jury could reasonably have concluded that the defendants used the mails to purchase automobiles for the express purpose of rolling back odometers. *See United States v. Green*, 786 F.2d at 250–51. The mailings were thus an integral part of the execution of the scheme to defraud.

The mailings in this case were integral to the scheme in a second respect. The mailings were used to purchase automobiles under various aliases. By concealing the identities of the true purchasers, these aliases insulated the Hensons from repercussions that might result from the scheme. The aliases were also necessary because many of the purchasers in the Henson organization, such as Ralph Lutz, either did not have an automobile dealer's license or could not participate in certain auctions as a result of previous mileage inaccuracies. In this sense, the mailings "facilitate[d] concealment of the fraudulent scheme." *Castile*, 795 F.2d at 1273.

Finally, the record contains evidence, viewed in a light most favorable to the government, that the Hensons used the mails to "wash" high mileage titles through a Tennessee company called APCO Leasing. The defendants apparently would use APCO Leasing when they could not alter the titles themselves. There can be little doubt that this use of the mails was an integral part of the scheme to defraud. *See United States v. Fallon*, 776 F.2d 727 (7th Cir.1985); *United States v. Lindsey*, 736 F.2d 433 (7th Cir.1984); *United States v. Galloway*, 664 F.2d 161 (7th Cir.1981),

*cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982).

The defendants argue that none of the alleged coconspirators actually used the mails, nor did they have "actual knowledge that the Bank of Marshall County was using the mails to send cashier's checks." On this record, however, the jury was entitled to conclude otherwise. "[O]ne 'causes' the mails to be used if he 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be forseen,' even though use of the mails was not actually intended." *United States v. Shryock,* 537 F.2d 207, 209 (5th Cir.1976) (quoting *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977). *See also United States v. Reed,* 721 F.2d 1059, 1060–61 (6th Cir.1983). We believe it was reasonably foreseeable that the mails would be used during the course of the scheme not only to purchase used cars under various aliases, but to launder titles to reduce mileage.

In sum, the jury could find that the mailings in this case were for the purpose of executing a scheme to defraud. Accordingly, the defendants' challenge to their convictions on count one of the indictment is without merit.

### III

Clenton Henson and Sheila Lutz contest various aspects of the seizure of documents from their East Fourth Street business office in Benton, Kentucky. First, they argue that Postal Inspector Edwards's affidavit in support of the search warrant contained material misrepresentations and, as a result, the warrant issued by the magistrate was invalid.

In his eight-page affidavit, Inspector Edwards described the fifteen-month investigation leading up to his request for the search warrant. Edward's investigation, initiated in March 1984, revealed that four used-car businesses, David Henson Used Cars, Dennis Used Cars, Alan Henson Used Cars and Gary Ray's Used Cars, operated together and were collectively known as "the Hensons." From June until December, 1983, the Hensons bought used cars in California and shipped them to Kentucky.

According to the affidavit, Edwards and a Kentucky police officer "personally investigated seventy-six (76) automobiles which were purchased during the period June 1983 through December 1983 at various California auto auction dealers...." The buyers of these vehicles were Dennis Used Cars and Gary Ray's Used Cars. Automobile invoices and odometer statements obtained from the auction companies indicated that the buyers of these vehicles included Clenton Henson, Alan Henson and Ralph Lutz. These cars were shipped to the Hensons' East Fourth Street address in Benton, Kentucky.

During his investigation of these automobiles, Edwards inspected copies of Kentucky motor vehicle registrations, title applications, automobile inspection forms and odometer statements. These documents were compared to the out-of-state motor vehicle titles and automobile auction invoices obtained from the auction companies in California. On the basis of this comparison, Edwards concluded: "It has been determined [that] the mileage on all of the corresponding Kentucky documents was significantly lower than mileage stated on the auction invoices and/or out-of-state titles from the California automobile auction dealers."

In his affidavit, Edwards also indicated that he talked to two automobile dealers who had business dealings with Clenton Henson. On May 16, 1985, Edwards spoke to Charles Aldridge, owner of Charlie's Used Cars. Aldridge, who had cars financed by Clenton Henson, told Edwards that "[f]or an additional $100 to $50 [above the financing fee], any dealer can get a signed affidavit regarding the roll-back mileage on any vehicle purchased from the Henson's [sic]."

That same day, Edwards spoke to Charles Haley, owner of Haley Used Cars. According to the affidavit, "Haley stated he had purchased and financed used cars

which had rolled-back mileage through Clinton [*sic*] Henson during 1983 and 1984.... For $50 Clinton [*sic*] would also provide an affidavit indicating the roll-back mileage on a vehicle. When he financed a car through Henson, he usually worked through Sheila Lutz, Sheila Tinsley or Mildred McCardy."

## A

■ Clenton Henson and Sheila Lutz argue that Edwards fabricated his conversations with Aldridge and Haley. Relying on *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), they contend that the affidavit should be reviewed for probable cause without the false portions. In *Franks*, the Supreme Court held that a search warrant must be voided and the fruits of the search excluded if a defendant shows by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause. *Id.* at 155–56, 98 S.Ct. at 2676.

The district court held a *Franks* hearing to consider the defendants' allegations. Although Aldridge testified that he never received a false odometer statement specifically from Clenton Henson, he did admit regularly receiving "a false odometer statement from the Fourth Street shop" in Benton, Kentucky where the Hensons maintained their business. He stated that he paid a fee of $50 or $100 to "Sheila," who would in turn provide the false statements.

Charles Haley testified that he had never bought a false odometer statement or title from Clenton Henson, yet he did acknowledge receiving false documents from Clenton Henson's business. On cross-examination, he stated that he did get false odometer statements from Sheila Lutz for $50. He also responded affirmatively when asked whether he knew he could get false odometer statements when he made financing arrangements with Clenton Henson.

The district court determined that Clenton Henson and Sheila Lutz did not meet

their burden of establishing by a preponderance of the evidence that the contested portions of Edwards's affidavit contained false statements made knowingly and intentionally or with reckless disregard for the truth. On the basis of the testimony discussed above, the district court's finding is not clearly erroneous. At best, the testimony of Aldridge and Haley indicates that they did not receive false documents from Clenton Henson personally, but did receive them from the Henson organization. This testimony is not inconsistent with Inspector Edwards's statements in his affidavit.

■ Having rejected the defendants' claim that certain portions of the affidavit should be disregarded, we have little trouble in concluding that the affidavit provided probable cause for issuance of the search warrant. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In particular, the affidavit contained the incriminatory statements of Haley and Aldridge, as well as Edwards's personal survey of 76 automobiles, which suggested that all 76 had false odometer readings. The affidavit also recounted the statements of a confidential informant, who outlined the Henson operation in great detail. Edwards verified much of this information during the course of his lengthy investigation.

## B

■ Next, Clenton Henson and Sheila Lutz argue that Edwards's affidavit, insofar as it suggested criminal activity, was based on information (the survey) that was over a year old. Since the affidavit contained "stale" information, it could not support a finding of probable cause. We disagree.

The affidavit also contains the May 1985 statements of Aldridge and Haley; these statements were made the same month that Edwards applied for the warrant. Thus, even assuming the survey was in some respect "stale," that would not prevent a finding of probable cause. *See Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir. 1987) ("Where recent information corroborates otherwise stale information, proba-

ble cause may be found."). Further, the affidavit suggests that the defendants were involved in an extensive odometer-tampering scheme, operating over a long time period. As the Eleventh Circuit has said:

> The function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate. Rather, the assay focuses on one relevant part of the determination that reasonable probable cause exists to warrant the issuance of an order to ... perform a search....
>
> [I]nformation which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists for the order to intrude.
>
> ....
>
> "In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime.... [I]f an affidavit recites activity indicating protracted or continuous conduct, time is of less significance."

*United States v. Haimowitz,* 706 F.2d 1549, 1554–55 (11th Cir.1983) (quoting *United States v. Weinrich,* 586 F.2d 481, 491 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979)), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). *See also United States v. Webster,* 734 F.2d 1048, 1056 (5th Cir.), *cert. denied sub nom. Hoskins v. United States,* 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). Based on the continuous nature of the criminal conduct being investigated, it was not unreasonable for the issuing magistrate to conclude that documents involved in the odometer-tampering scheme would be found in the Hensons' office on the date Inspector Edwards applied for the search warrant (May 21, 1985). *See Haimowitz,* 706 F.2d at 1555.

### C

■ We also reject the defendants' contention that the search warrant issued by the magistrate did not describe with partic-

ularity the items to be searched for and seized, in conformity with the Fourth Amendment. The warrant authorized the police to search for:

> any and all records, but not limited to modules, modems and connectors, computer, computer terminals, hard copy user documentation pertaining to files and/or programs, cables, printers, discs, floppy discs, tapes, vendor phone numbers, all original and backup tapes and discs, any other informational data input, all vendor manuals for hardware and software, printouts, receipt books, ledger books, ledger cards, records of sales, odometer statements, file records on individual used car dealers, file records, payment receipts, bank transaction records, invoices regarding the purchase of used vehicles, automobile auction company records and/or lists, any correspondence from auto auction companies, and any motor vehicle titles for the period from June 1983 through the present, including but not limited to the following individuals and companies:
>
> > Clinton [*sic*] Henson, Henson Motor Company, Sheila Henson Lutz, Allen [*sic*] Henson, Ronnie Walston and/or Walston Used Cars, Charles Haley and/or Haley Used Cars, Charlie Aldridge, 79 Motors, Bob Pugh, Ralph Lutz, Shane Howard and T.S. Motors
>
> Also, any other used car dealers conducting business with Henson Motor Co., and/or Allen [*sic*] Henson. It is also requested that the vehicle identification number and/or tag number be recorded on any vehicles found in the parking lot surrounding the building.

■ General warrants that fail to describe with particularity the things to be searched for and seized "create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure and a danger that items will be seized when the warrant refers to other items." *United States v. Savoca,* 761 F.2d 292, 298–99 (6th Cir.), *cert. denied,* 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985). *See Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627

(1976). However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought. "Thus a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Blum,* 753 F.2d 999, 1001 (11th Cir.1985) (citation omitted).

In the instant case, although the warrant uses generic terms, Inspector Edwards could not have known at the time he applied for the warrant what precise records and files would contain information concerning the odometer-tampering scheme. "Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice." *United States v. Porter,* 831 F.2d 760, 764 (8th Cir.1987) (quoting *United States v. Johnson,* 541 F.2d 1311, 1313 (8th Cir.1976)), *cert. denied,* — U.S. ——, 108 S.Ct. 1037, 98 L.Ed.2d 1001 (1988). The description in the warrant is directed toward items likely to provide information concerning the Hensons' involvement in the odometer-tampering scheme and therefore did not authorize the officers to seize more than what was reasonable under the circumstances.

Indeed, the breadth of the warrant here actually weighs in favor of admitting the evidence. Because the warrant in this case was "inclusive," it did not leave room for the officers to exercise unlimited discretion. *See Savoca,* 761 F.2d at 299. If we ask, as this court did in *Savoca,* whether there was probable cause to support a search of this breadth, we would have no hesitation in concluding that there was.

The defendants argue that the warrant should have been limited to the 76 automobiles involved in Inspector Edwards's survey. His affidavit suggested an ongoing scheme to purchase automobiles and resell them with tampered odometers. Edwards had good reason to believe that some of the vehicles, and their accompanying documents, identified during the survey would no longer be on the premises when the warrant was executed, while others would have been added. In short, the warrant in

this case was as "specific as the nature of the activity under investigation permitted." *United States v. Shoffner,* 826 F.2d 619 (7th Cir.) (citation omitted), *cert. denied sub nom. Stange v. United States,* — U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987).

Additionally, we note that other courts have approved warrants at least as general as the one attacked here. *See, e.g., Shoffner,* 826 F.2d at 630–31 (and cases cited therein). We thus conclude that the warrant was reasonably specific under the circumstances of this case.

### D

■■■■ Lastly, we find no merit to the defendants' contention that the search went "flagrantly" beyond the scope of the warrant; that "Edwards engaged in a seizing frenzy, confiscating office supplies, blank paper, horse records, divorce records, and personal income tax records without a time limitation or any other limitation."

■■■■ A search does not become invalid merely because some items not covered by a warrant are seized. *United States v. Lambert,* 771 F.2d 83 (6th Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed. 2d 577 (1985). This is especially true where the extra-warrant items were not received into evidence against the defendant. *United States v. Shilling,* 826 F.2d 1365, 1369 (4th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988). Absent flagrant disregard for the limitations of a search warrant, the items covered by the warrant will be admissible. *Lambert,* 771 F.2d at 93.

In this case, we do not find a flagrant disregard for the terms of the search warrant. Since the extensive seizure of records was authorized by the terms of the warrant, it was inevitable that the officers would seize documents that were not relevant to the proceedings at hand. We do not think it is reasonable to have required the officers to sift through the large mass of documents and computer files found in the Hensons' office, in an effort to segregate those few papers that were outside

the warrant. *See Marvin v. United States*, 732 F.2d 669, 675 (8th Cir.1984).

## IV

■■■ Clenton Henson attacks his conviction under the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 1981 *et seq.* The Act seeks to prevent "tampering with odometers on motor vehicles and to establish certain safeguards for the protection of purchasers with respect to the sale of motor vehicles having altered or reset odometers." *Id.* at § 1981. Section 1988(b) states that "[n]o transferor shall ... give a false statement to a transferee in making any disclosure" of the cumulative mileage registered on odometers. A "transferor" is defined as "any person who transfers ownership in a motor vehicle by sale, gift, or any means other than by creation of a security interest," 49 C.F.R. § 580.3; a "transferee" is "any person to whom the ownership in a motor vehicle is transferred by purchase, gift, or any means other than by creation of a security interest." *Ibid.*

The Act also contains a criminal enforcement provision, under which Clenton was convicted. At times pertinent to this case, section 1990c read:

> Any person who knowingly and willfully commits any act or causes to be done any act that violates any provision of this subchapter or knowingly and willfully omits to do any act or causes to be omitted any act that is required by such provision shall be fined not more than $50,000 or imprisoned not more than one year, or both.

Clenton Henson argues that he could be convicted under 1990c for giving a false mileage statement to a transferee only if the government proved that he was a "transferor" within the meaning of section 1988(b). He says the district court improperly instructed the jury that he could be found guilty if the government proved that he gave, or *caused a transferor to give,* a

false odometer statement to a transferee as alleged in the indictment. In other words, the court instructed the jury that Clenton could be held criminally liable under section 1990c even if he were not a "transferor."

We believe the defendant misreads the pertinent statutory provisions. Section 1990c specifically states that "[a]ny person who knowingly and willfully ... causes to be done any act that violates any provision of this subchapter," including section 1988(b), will be criminally liable. By using language that is similar to 18 U.S.C. § 2(b), we believe Congress contemplated that similar principles would apply. Under 18 U.S.C. § 2(b), defendants can be convicted as causers, even though they are not legally capable of personally committing the act forbidden by the federal statute and even though the agent caused to do the criminal act was guiltless of the crime. *United States v. Keefer*, 799 F.2d 1115 (6th Cir. 1986); *United States v. Ruffin*, 613 F.2d 408 (2d Cir.1979).

Thus, even assuming Clenton Henson was not a transferor within the meaning of section 1988(b), the jury could find that he adopted a transferor's acts and capacity by causing a transferor to commit a criminal act. Consequently, the district court did not err in instructing the jury as it did.[3]

If we were to accept Clenton Henson's interpretation, that only transferors who give or cause to be given a false odometer statement can be convicted, we would create a gaping loophole in the law that would hinder, rather than promote, accurate reporting of mileage information to the consumer. Consider, for example, an automobile dealer's corrupt employee, who alters the odometer statements of his employer's vehicles without the latter's knowledge. Under Clenton Henson's interpretation, this employee could not be convicted under section 1990c because he is not a transferor. We do not believe the Act countenances such an outcome.

---

**3.** We have examined the legislative history of the Act and do not find any pronouncements inconsistent with the conclusion we reach in this case. *See* S.Rep. No. 155, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin.News 1718; H.R.Rep. No. 764, 94th Cong., 1st Sess. (1975).

Clenton relies on *United States v. Powell*, 806 F.2d 1421 (9th Cir.1986), which we do not find to be controlling. In that case, Powell, a sales manager for a company that bought cars at auction and resold them to used car retailers, arranged the sale of used cars knowing that the odometers had been rolled back. Powell also falsely certified that the odometer readings were accurate. He was convicted of six counts of falsely certifying automobile odometer readings in violation of 15 U.S.C. §§ 1988(b) and 1990c, but the Ninth Circuit reversed his conviction on these counts. The court of appeals held that, even though Powell willfully provided false mileage information to a transferee, he could not be held liable because he was not a "transferor" within the meaning of section 1988(b). *Id.* at 1423. The court said that Powell may have held himself out as an owner of the vehicles at issue, arranged the sales and signed the sales certificates as transferor, but he was at all times merely an agent for the true transferor, his employer. *Ibid.*

In *Powell*, the government raised the same argument it makes here; that Powell should be held liable under 1990c because he caused his employer, the transferor, to violate section 1988(b) by furnishing mileage certificates that he knew to be false. *Ibid.* Significantly, the court believed that this "certainly" was a "viable theory," but refused to consider it because the argument was raised for the first time on appeal. *Ibid.* The *Powell* court did not reach the issue we decide here, and we thus do not find it controlling.

After carefully reviewing the record, and making all reasonable inferences favorable to the government, we similarly find no merit to Clenton Henson's contention that there was insufficient evidence to support the jury's verdict that he gave, or caused a transferor to give, false odometer statements. Likewise, we find sufficient evidence to support a finding of venue in the Western District of Kentucky. It is clear from the record that the Henson organization was based in that District, and many of the steps that were integral to the odometer-tampering scheme took place therein.

## V

Clenton Henson and Alan Henson argue that the district court improperly enhanced their fines on count one of the indictment, under the Criminal Fine Enforcement Act (CFEA), Pub.L. No. 98–596, 98 Stat. 3137, codified at 18 U.S.C.A. § 3623.[4] Section 3623, entitled "Alternative fines," applies to offenses committed after December 31, 1984. *United States v. Holmes*, 822 F.2d 481, 491 (5th Cir.1987). Focusing on the overt acts alleged in count one of the indictment, the last of which occurred on May 19, 1984, the defendants contend the CFEA is inapplicable because the offenses occurred before December 31, 1984. The Act's application, they say, would violate the *ex post facto* clause of the Constitution. U.S. Const. art. I, § 9, cl. 3.

This argument must fail. A jury's verdict represents a finding that a crime was committed as alleged in the indictment, which means in this case "[o]n or about and between January 1, 1983, up to and including January 1, 1985...." *See United States v. Calabrese*, 825 F.2d 1342, 1346 (9th Cir.1987). Thus, when the jury convicted Clenton Henson on count one, it found that the crimes took place up to and including January 1, 1985. Alan Henson's plea of guilty had the same effect as the jury verdict against Clenton Henson; his plea represents a finding that he was involved in the conspiracy up to and including January 1, 1985.

We also do not find it dispositive that the last overt act alleged in the indictment antedates the effective date of the CFEA. It is axiomatic that all the overt acts in furtherance of a conspiracy need not be alleged in the indictment. *United States v. Barnette*, 800 F.2d 1558, 1571 (11th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct.

---

**4.** The CFEA has since been repealed, effective November 1, 1987. Pub.L. 98–473, 98 Stat.
1987.

**1386**

1578, 94 L.Ed.2d 769 (1987). Moreover, there was evidence of other acts that were performed in furtherance of the conspiracy after December 31, 1984. *See United States v. Purther,* 823 F.2d 965, 968 (6th Cir.1987) (restitution was available with respect to mail fraud scheme which continued after the effective date of the Victim and Witness Protection Act of 1982, 18 U.S.C. § 3580 (1982), even though the overt acts alleged in the indictment were performed before the effective date). For example, Ronald Walston testified that he continued to deal with Sheila Lutz in the early part of 1985 in connection with the odometer-tampering scheme. Carol Lindsey stated that she noticed mileage discrepancies in the documents she was handling during the first part of 1985. Moreover, when federal agents searched the Hensons' business office in May 1985, they found numerous blank odometer statements listing the names of "false" dealers. Hence, the district court did not err in applying the increased penalties of the CFEA, which were applicable on January 1, 1985.

Because of the foregoing analysis, we necessarily reject the Hensons' contention that the enhancement of their fines under the CFEA violated the constitutional prohibition against *ex post facto* laws. Where, as in this case, a crime is still being carried on and continued after the date when the Act became effective, a statute imposing a greater penalty for conspiracy does not violate the *ex post facto* clause. *United States v. Todd,* 735 F.2d 146, 150 (5th Cir. 1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

Having considered the defendants' remaining contentions, including their challenge to the jury instructions, and finding them to be without merit, we AFFIRM all the convictions and the sentences.