966 F.2d 1455
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph Emile SISSLER, Defendant-Appellant.
 No. 91-2113.
 United States Court of Appeals, Sixth Circuit.
 June 10, 1992.
 
 Before GUY and BOGGS, Circuit Judges, and RONEY, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 The defendant in this marijuana possession case appeals from the district court's denial of his motion to suppress evidence obtained from a search of a home in which he was a guest. We affirm.
 
 I.
 
 2
 This appeal arises out of the execution of a warrant to search a house owned by Robert Baldori in Okemos, Michigan. Baldori, a professional musician and attorney, shared his house with his girlfriend, Kelly Boyle. At the time of the search, Baldori, Boyle, and their overnight guest, the defendant Joseph Sissler, were in the house.
 
 
 3
 On January 12, 1990, four days before the search was carried out, an FBI agent obtained an anticipatory warrant from a federal magistrate to search Baldori's house. The warrant was contingent on an informant, Jim Joseph, successfully completing the delivery of police-supplied marijuana to Baldori at his home, pursuant to an agreement between Joseph and Baldori. The warrant authorized the police to seize marijuana, scales, proceeds of marijuana sales in the form of U.S. currency, records of marijuana transactions, records of assets purchased with marijuana proceeds, safety deposit box keys, and phone numbers of marijuana suppliers and customers.
 
 
 4
 Joseph delivered 88 pounds of marijuana to Baldori late on the evening of January 15, 1990. While Joseph was inside, Sissler arrived in a car bearing Virginia tags and entered the house. Neither the officers nor Joseph were expecting anyone to arrive, and Sissler was unknown to the authorities. Joseph emerged from the house shortly after midnight and confirmed that he had delivered the marijuana to Baldori. He had not spoken with Sissler.
 
 
 5
 Approximately 24 local and federal officers then executed the warrant and searched the house for more than 5 hours. The police combed the entire house and opened containers, including Sissler's briefcase and overnight bag. The officers recovered the marijuana delivered by Joseph, seized large amounts of currency from Sissler's overnight bag and elsewhere, and arrested Baldori and Sissler. They also seized records belonging to Baldori. The seizure included 500 computer disks, as well as three personal computers, two printers, and a modem. Some of the local officers also seized sexually explicit photographs and slides of Kelly Boyle.
 
 
 6
 An IRS agent and officers from a local forfeiture unit also participated in the search. They seized records, some dating back to 1969, in an apparent attempt to determine Baldori's net worth. The forfeiture unit also seized a fax machine.
 
 
 7
 During the search, the officers separated Sissler and Baldori, warned Sissler of his Miranda rights, and questioned him. In response to these questions, Sissler indicated that he had intended to use the cash found in his overnight bag to buy marijuana from Baldori.
 
 
 8
 One week later, a federal grand jury charged Sissler with attempting to possess marijuana with intent to distribute. He moved to suppress his statements and the evidence seized from Baldori's house. After the district court denied the motion, Sissler entered a conditional guilty plea to the attempted possession charge.
 
 
 9
 Meanwhile, state authorities were investigating the conduct of some of the local officers who had participated in the search. This investigation led a state prosecutor to charge two of the officers with criminal offenses.
 
 
 10
 Sissler moved to reopen the suppression hearing, and the district court granted the motion, limiting the hearing to the issue of whether the officers had flagrantly disregarded the scope of the warrant. At the reopened suppression hearing, Sissler called several of the officers who had been charged or were being investigated by the state prosecutor. Each of these officers refused to testify about his role in the search and invoked the Fifth Amendment privilege against self-incrimination.
 
 
 11
 At the conclusion of the reopened suppression hearing, the district court again denied Sissler's motion to suppress the fruits of the search. This appeal followed.[1]
 
 II.
 
 12
 Sissler first argues that his Confrontation Clause rights were violated when several of the officers who had participated in the search invoked the privilege against self-incrimination when Sissler called them to testify during the suppression hearing. He maintains that the officers' refusal to testify deprived him of his right to confront adverse witnesses.
 
 
 13
 As an initial matter, the government concedes that Sissler has a Confrontation Clause right to examine any witness who gives "damaging" testimony against him, even if Sissler called the witness to testify. See Chambers v. Mississippi, 410 U.S. 284, 298 (1973). However, the government points out that the officers who asserted the privilege gave no testimony of any kind against Sissler at the suppression hearing.
 
 
 14
 Even if we were to agree with Sissler that the officers who declined to answer questions were somehow witnesses against him, we would not hold that their silence violated his Confrontation Clause rights. The Sixth Amendment does not compel the government to produce all witnesses competent to testify, see United States v. Moore, 954 F.2d 379, 381 (6th Cir.1992), nor does it compel government witnesses who do testify to waive their testimonial privileges, see McCray v. Illinois, 386 U.S. 300, 314 (1967).
 
 
 15
 Finally, we observe that the Supreme Court has rejected Confrontation Clause challenges to the use of incompetent testimony during suppression hearings. See United States v. Matlock, 415 U.S. 164, 175 (1974); McCray, 386 U.S. at 314; see also United States v. Boyce, 797 F.2d 691, 693 (8th Cir.1986) ("the right of confrontation does not apply to the same extent at pretrial suppression hearings as it does at trial"). The Court has repeatedly explained that "[t]he right to confrontation is basically a trial right." Barber v. Page, 390 U.S. 719, 725 (1968); see also Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987) (Powell, J.); California v. Green, 399 U.S. 149, 157 (1970).
 
 
 16
 Accordingly, we hold that Sissler's Sixth Amendment rights were not violated when several officers invoked the Fifth Amendment privilege against self-incrimination during the suppression hearing.
 
 III.
 
 17
 Sissler argues that the search violated his rights under the Fourth Amendment. Specifically, he contends that: (1) probable cause was absent at the time the magistrate issued the anticipatory search warrant; (2) the police failed to execute the warrant within the time specified; (3) the search warrant did not authorize the police to open his overnight bag and briefcase; (4) the search warrant was unconstitutionally overbroad; and (5) the police flagrantly disregarded the terms of the warrant and conducted a general search.
 
 
 18
 We must first determine whether Sissler has standing to raise all of these arguments. The district court concluded that Sissler was an overnight guest and, as such, has standing to challenge the search of the Baldori home. The government concedes that Sissler was an overnight guest and has standing to challenge the search of his personal belongings and his "guest quarters" at the Baldori residence, but argues that he lacks standing to attack the search of the rest of the house.
 
 
 19
 The Supreme Court recently considered the Fourth Amendment standing of overnight guests in Minnesota v. Olson, 495 U.S. 91 (1990). In Olson, the Court held that the defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." Id., 495 U.S. at 96-97. The Court further elaborated:
 
 
 20
 That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises.
 
 
 21
 Id. at 99 (emphasis added).
 
 
 22
 Olson contains no language to support the government's argument that an overnight guest obtains a privacy interest only in his guest quarters.[2] On the contrary, a natural reading of Olson suggests that an overnight guest's privacy interest in a home is not limited unless the host restricts the guest's movements. See United States v. Osorio, 949 F.2d 38, 41 (2d Cir.1991) (holding that overnight guest had standing to challenge search of entire premises absent proof that host restricted guest's movements).
 
 
 23
 Since the government does not point to any evidence that Baldori limited Sissler's movements about the house, we conclude that Sissler has standing to challenge the search of the entire house. We now turn to Sissler's specific Fourth Amendment arguments.
 
 A.
 
 24
 Sissler maintains that the magistrate lacked probable cause when he issued the anticipatory search warrant four days before Joseph delivered the marijuana to Baldori's home. This claim requires us to review the information available to the magistrate at the time he issued the warrant.
 
 
 25
 On January 10 and 11, 1990, Joseph, wearing a transmitting device and a tape recorder, met with Baldori to negotiate the sale of approximately 100 pounds of marijuana. On January 11, Baldori told Joseph that he could not take delivery until January 15. The state police then made arrangements to provide Joseph with marijuana for delivery on January 15. On January 12, FBI Agent Dennis Langkos sought and obtained the anticipatory warrant at issue in this appeal. Langkos' affidavit contained the information obtained from Joseph, as well as other information. The warrant was expressly conditional on Joseph successfully delivering marijuana to the Baldori home.
 
 
 26
 Sissler argues that no probable cause for the search existed until Joseph actually delivered the marijuana late on the evening of January 15. He maintains that the issuance of the anticipatory warrant allowed the authorities to manufacture probable cause after obtaining the warrant.
 
 
 27
 Sissler relies heavily on the decision in United States v. Hendricks, 743 F.2d 653, 654-55 (9th Cir.1984), cert. denied, 470 U.S. 1006 (1985), in which the Ninth Circuit stated that an anticipatory warrant is valid only if the contraband is on a "sure course" to the place to be searched. The court held that a suitcase containing cocaine was not on a sure course to the defendant's home at the time the warrant was issued because there was no assurance that the defendant would pick up the suitcase at the airport or that he would take it home if he did pick it up. Id. At least two other circuits have adopted the sure course standard employed by the Ninth Circuit. See United States v. Nixon, 918 F.2d 895, 903 n. 6 (11th Cir.1990); United States v. Goodwin, 854 F.2d 33, 36 (4th Cir.1988);
 
 
 28
 The government points to United States v. Garcia, 882 F.2d 699, 702-03 (2d Cir.), cert. denied, 493 U.S. 943 (1989), in which the Second Circuit upheld an anticipatory warrant contingent upon an informant's controlled delivery of cocaine to the defendant's home. The court held that an anticipatory warrant is valid in such a situation so long as there is probable cause to believe that the contraband will be on the premises at the time the search is executed. Id., 882 F.2d at 703.
 
 
 29
 We had earlier reached the same conclusion as the Garcia court in a case involving the mailing of a package containing heroin. United States v. Lowe, 575 F.2d 1193 (6th Cir.), cert. denied, 439 U.S. 869 (1978). In Lowe, we upheld the use of an anticipatory warrant so long as "there is probable cause to believe that [the contraband] will be there when the search warrant is executed." Id., 575 F.2d at 1194.
 
 
 30
 We need not decide whether the police must show that the contraband is on a sure course or whether they need merely establish probable cause to believe that it will be at the place to be searched. The anticipatory warrant in this case is valid under either standard.
 
 
 31
 At the time the warrant was issued, the police controlled the marijuana that was eventually delivered to Baldori. Joseph, an informant working for the government, had arranged to deliver it to Baldori's home on January 15. These undisputed facts support a finding that the marijuana was on a sure course to Baldori's home at the time the warrant was issued. As the Ninth Circuit acknowledged in Hendricks, a controlled delivery by the government can satisfy the requirement that the contraband be on a sure course to the place to be searched. 743 F.2d at 655.[3]
 
 
 32
 We find that there was sufficient assurance that marijuana would be delivered to Baldori's home to satisfy both the sure course and probable cause standards. Accordingly, we hold that the magistrate validly issued the warrant.
 
 B.
 
 33
 Sissler next argues that the authorities failed to execute the warrant within the time specified. The warrant commanded the officers to search Baldori's home "upon the delivery of marijuana." (App. 680). Sissler complains that the agents did not execute the warrant until more than two hours after Joseph arrived with the marijuana.
 
 
 34
 The government points out that the warrant was not executed for several hours because the officers waited until Joseph left the house before executing the warrant. The officers could not be sure that delivery actually had occurred until Joseph came out without the marijuana. The officers executed the warrant shortly after Joseph emerged. Accordingly, we find that the officers executed the warrant "upon the delivery" of the marijuana in a timely manner.
 
 C.
 
 35
 Sissler argues that the officers lacked probable cause to open his briefcase and overnight bag. The officers found the briefcase in Baldori's recording studio and the overnight bag in an office. Inside the overnight bag, the officers discovered prescription medication in Sissler's name and $130,000 in cash. The briefcase contained $1,120 in cash.
 
 
 36
 A warrant that authorizes officers to search a home also authorizes them to open containers that might contain items within the scope of the warrant. United States v. Ross, 456 U.S. 798, 821 (1982); United States v. Calarco, 668 F.2d 920, 921 (6th Cir.1982). However, "special concerns may arise when visitors are present on the premises." United States v. Gray, 814 F.2d 49, 51 (1st Cir.1987).
 
 
 37
 In Gray, the First Circuit refused to exclude evidence found in a jacket during the execution of a search warrant because the police did not know that the jacket belonged to a visitor when they began to search it. Id. In this case, the district court found that the searching officers did not know who owned the overnight bag and briefcase until after they had opened them. Since there is no evidence that this factual finding is clearly erroneous, we conclude that the officers did not violate the Fourth Amendment by opening Sissler's bag and briefcase.[4]
 
 
 38
 Even if we were to find that the officers knew or should have known that Sissler owned the bag and briefcase, we would find that these items were within the scope of the warrant. An item belonging to a visitor may be searched if there is a relationship between the visitor and the place. See United States v. Giwa, 831 F.2d 538, 544-45 (5th Cir.1987) (upholding search of overnight visitor's bag); Gray, 814 F.2d at 51 (upholding search of visitor's property found inside residence where a late-night drug deal had just occurred). Conversely, if there is no reason to suspect that a person found on the premises is connected with a crime or is anything more than a casual visitor, the police may not search his or her belongings. See United States v. Robertson, 833 F.2d 777, 784 (9th Cir.1987); United States v. Micheli, 487 F.2d 429, 432 (1st Cir.1973).
 
 
 39
 Sissler arrived late at night while a major drug deal was occurring. He was an overnight guest, not a mere visitor. Therefore, he was sufficiently connected to the home to fall within the scope of the warrant.
 
 D.
 
 40
 Sissler contends that the search warrant was facially overbroad. Specifically, he argues that the warrant failed to identify the items to be seized with sufficient particularity. We review search warrant overbreadth claims de novo. United States v. Gahagan, 865 F.2d 1490, 1496 (6th Cir.), cert. denied, 492 U.S. 918 (1989).
 
 
 41
 The Fourth Amendment requires that search warrants describe the items to be searched for and seized with particularity so that the warrant does not authorize the police to conduct a general rummaging search. Andresen v. Maryland, 427 U.S. 463, 480 (1976). The degree of specificity required varies with the type of item sought, but a description is valid if it is as specific as the circumstances permit. United States v. Henson, 848 F.2d 1374, 1383 (6th Cir.1988), cert. denied, 488 U.S. 1005 (1989). At an "irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized." United States v. Leary, 846 F.2d 592, 602 (10th Cir.1988).
 
 
 42
 The search warrant in this case authorized the officers to search for and seize: (1) marijuana; (2) scales used to weigh marijuana; (3) proceeds of marijuana sales in the form of U.S. currency; (4) records of marijuana transactions; (5) records of assets purchased with the proceeds of marijuana transactions; (6) safety deposit box keys; and (7) phone and address books containing names, addresses, and phone numbers of marijuana customers and suppliers.
 
 
 43
 Sissler argues that the third, fourth, and fifth items are overbroad. He points out that the warrant contained no guidelines to tell the executing officers how to distinguish currency that came from marijuana transactions from other currency. Consequently, the police seized all the currency on the premises, including $130,000 from Sissler's bag, $1,120 from Sissler's briefcase, $550 from Sissler's money belt, $143 from Sissler's wallet, and more than $17,000 from other locations in the house.[5]
 
 
 44
 Although the seizure of all of the currency is troubling, Sissler does not explain how a more detailed warrant would have allowed the officers to distinguish marijuana proceeds from other currency. Since there was probable cause to believe that there would be marijuana proceeds on the premises and since a more specific description was not possible, we conclude that the description of the currency in the warrant was not overbroad. See Henson, 848 F.2d at 1383.
 
 
 45
 Sissler argues that the descriptions of records of marijuana transactions and assets purchased with marijuana proceeds are overbroad. The affidavit supporting the warrant provided evidence that Baldori had been selling marijuana since early 1989, but the warrant did not command the officers to limit their search to recent records. The police seized some of Baldori's records dating back more than 20 years.
 
 
 46
 The absence of a time limitation does not make a warrant overbroad if the magistrate is unable to specify an appropriate time frame. See United States v. Shilling, 826 F.2d 1365, 1369 (4th Cir.1987), cert. denied, 484 U.S. 1043 (1988). However, when there is information available to limit a search for records, the warrant is overbroad if it contains no such limitations. See United States v. Cardwell, 680 F.2d 75, 78 (9th Cir.1982) (reversing conviction where overbroad warrant contained no time limitation).
 
 
 47
 Assuming, without deciding, that the records portion of the warrant was facially overbroad, the normal remedy is to sever that portion of the warrant from the portions that do pass constitutional muster. United States v. Blakeney, 942 F.2d 1001, 1027 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 881 (1992); Cardwell, 680 F.2d at 78. Since none of the records seized pertained to Sissler, the suppression of items seized pursuant to the arguably overbroad portions of the warrant would provide him with no relief. Sissler's requested remedy, suppression of all items seized in the search, would be appropriate only if the entire warrant were overbroad. Cardwell, 680 F.2d at 78-79. Accordingly, we find that the warrant was not facially overbroad as to the evidence to be introduced against Sissler.[6]
 
 E.
 
 48
 Sissler and the amicus, the American Civil Liberties Union, contend that the evidence from the search must be suppressed because the police exceeded the terms of the warrant by indiscriminately seizing items that were outside the scope of the warrant. Sissler and the ACLU argue that the officers conducted the search with flagrant disregard for the limitations of the warrant.[7] This claim requires us to review in some detail the items that were seized from the Baldori house.
 
 
 49
 We begin with the electronic equipment. The search warrant return indicates that the officers seized three computers, two printers, a modem, a fax machine, and several disk drives. The language of the search warrant does not appear to support the seizure of any of these items.
 
 
 50
 The government argues that the officers needed to seize the computers because drug records could have been stored in their internal memories. Accepting this contention as true, the government does not explain why the police also needed to seize printers, modems, and disk drives.
 
 
 51
 As to the fax machine, the government maintains that it was not responsible for the seizure because a state forfeiture team seized it. We disagree. Since the local officers entered the house under the federal warrant and had no independent authority to seize items not covered by the federal warrant, we must consider everything seized as part of the same search. See United States v. Medlin, 842 F.2d 1194, 1197 (10th Cir.1988). We also observe that a federal agent prepared the warrant return that listed the fax machine.
 
 
 52
 Detective Early, from the state forfeiture unit, testified that he seized the fax machine because the unit was interested in any item that appeared to be new. A grand piano and a stereo were spared because they appeared to be old.
 
 
 53
 Second, the officers seized $1,030 in Canadian currency. Boyle testified that she had earned the money working in Windsor, Ontario. The warrant authorized the seizure of only U.S. currency.
 
 
 54
 Third, the officers seized records that fell outside of the scope of the warrant. The testimony of officers who participated in the search indicated that the house was cluttered with poorly organized records and that the officers seized only 10 percent of the records.
 
 
 55
 We agree with the government and the district court that, under those circumstances, the agents need not read each individual document to determine whether it falls within the warrant. See Henson, 848 F.2d at 1383. It is therefore inevitable that the officers will seize some documents that are outside the scope of the warrant, particularly since Baldori kept voluminous records relating to his legal and musical careers on the premises.
 
 
 56
 Detective Early testified that most of the records he seized, some dating back to 1969, were taken in an attempt to establish Baldori's net worth. The warrant did authorize seizure of records showing purchases made with marijuana proceeds, but did not authorize the officers to seize all of Baldori's financial records to establish his net worth. The intentional seizure of those documents goes far beyond the terms of the warrant.
 
 
 57
 Fourth, the officers seized more than 30 intimate photographs and slides of Boyle. The government concedes that the photos and slides are not covered by the warrant. The officer or officers who took the slides and photos did not list them on the search warrant return. Two officers have been charged in state court with illegally taking items during the search.[8]
 
 
 58
 We observe that the evidence incriminating Sissler, the cash found in his overnight bag and briefcase, was within the scope of the warrant. In United States v. Lambert, 771 F.2d 83, 93 (6th Cir.), cert. denied, 474 U.S. 1034 (1985), we stated that the unlawful seizure of items outside of the scope of the warrant normally does not require the suppression of evidence lawfully seized. However, we went on to explain that "[a] flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search requiring the suppression of all evidence seized during the search." Id., 771 F.2d at 93.
 
 
 59
 The government cites several cases in which courts have found that officers who exceeded the scope of a warrant did not act in flagrant disregard of the warrant.[9] Sissler points out that in those cases the officers seized items, typically records, not covered by the warrant while searching for similar items that were within the scope of the warrant.
 
 
 60
 Sissler argues that the facts in this case are similar to those considered by the Tenth Circuit in Medlin. In Medlin, federal officers obtained a warrant to search for firearms in the defendant's home. Local officers accompanied the federal officers and seized 667 items of allegedly stolen property. The Tenth Circuit upheld the suppression of all evidence, including the firearms, concluding that the officers flagrantly disregarded the limitations of the warrant by searching for and seizing the allegedly stolen property. Medlin, 842 F.2d at 1199; see also United States v. Rettig, 589 F.2d 418, 423 (9th Cir.1978) (ordering suppression of all evidence where police conducted general search).
 
 
 61
 We agree that the record establishes that some of the officers apparently engaged in egregious misconduct while searching the Baldori home. Unlike the defendants in Medlin and Rettig, however, Sissler's rights were not violated by the misconduct. All of the property seized from him was within the scope of the warrant. Thus, even if we were to find that the officers searched Baldori's home in flagrant disregard of the warrant's scope, we would find that the officers did not violate Sissler's rights. We believe deterrence would not be served by allowing Sissler to benefit from the alleged violation of Baldori's and Boyle's Fourth Amendment rights. Cf. Medlin, 842 F.2d at 1200 (finding exclusion of legally seized weapons serves deterrence where officers violated defendant's rights by illegally seizing hundreds of items). Accordingly, we affirm the district court's denial of Sissler's motion to suppress.
 
 IV.
 
 62
 Sissler finally argues that the statements he made to the officers must be suppressed. Sissler concedes that the interrogating officers read him his Miranda rights, that he signed a consent form acknowledging his rights, and that he agreed to talk with the officers before he made the incriminating statements. The testimony of the interrogating officers indicates that Sissler engaged in a wide-ranging conversation for approximately two hours until he indicated that he wished to speak with an attorney. The interrogation then stopped.
 
 
 63
 We find no evidence in the record to support Sissler's claim that the officers coerced him into making the incriminating statements. Instead, the evidence indicates that Sissler voluntarily waived his Miranda rights and agreed to talk with the officers.[10] We affirm the district court's refusal to suppress Sissler's statements.
 
 
 64
 AFFIRMED.
 
 
 
 *
 Honorable Paul H. Roney, United States Court of Appeals for the Eleventh Circuit, sitting by designation
 
 
 [1]
 After denying Sissler's renewed motion to suppress, the district court sentenced Sissler to 57 months imprisonment but allowed him to continue his bond pending the outcome of this appeal
 
 
 [2]
 The government's reliance on Rakas v. Illinois, 439 U.S. 128 (1978), is misplaced. In Rakas, the Court held that a car passenger has no legitimate expectation of privacy in the car's glove compartment. Id. at 148-49. In dicta, the Court explained that a "casual visitor" to a home has no standing to challenge the search of the basement he has never seen. Id. at 142. In Olson, the Court carefully explained its holding in Rakas and held that an overnight guest, unlike a casual visitor on the premises, has a privacy interest in his host's home. Olson, 495 U.S. at 97-99
 
 
 [3]
 Sissler argues that the sure course requirement is satisfied only if the contraband is in the mail. The Hendricks court listed a mailing as an example of a controlled delivery satisfying the sure course requirement. 743 F.2d at 655. The court never suggested that the warrant would have been valid only if the suitcase had been mailed to Hendricks; instead, the warrant was invalid because there was no assurance that Hendricks would pick up the suitcase and return to his home. Id. By contrast, the affidavit for the warrant in this case stated that Joseph would deliver the marijuana to Baldori's house
 
 
 [4]
 Sissler argues that the officers should have realized that the overnight bag was his and stopped searching when they found a pill bottle bearing his name. Even assuming that the discovery of the pill bottle would have obligated the officers to close the bag, there is no indication in the record that the officers discovered the pill bottle before they found the cash
 
 
 [5]
 The seizure included $1,030 in Canadian currency which belonged to Boyle. The government concedes that seizure of the Canadian currency was beyond the scope of the warrant
 
 
 [6]
 Sissler also argues that the search was a pretext to allow agents from the IRS and the state forfeiture unit to enter the home. Sissler cites to no authority supporting his claim that the Fourth Amendment bars state police and IRS agents from accompanying FBI agents during the execution of a federal search warrant. However, those accompanying agents are bound by the terms of the search warrant
 
 
 [7]
 The ACLU also claims that some of the officers were completely ignorant of the warrant's limitations and that their ignorance converted the search into an unconstitutional general search. See United States v. Heldt, 668 F.2d 1238, 1261-62 (D.C.Cir.1981), cert. denied, 456 U.S. 926 (1982). Our review of the record reveals that, although some of the officers had an expansive view of the search, there is no evidence that the officers were completely ignorant of the contents of the warrant
 
 
 [8]
 Sissler's brief repeatedly calls attention to the fact that some of the local police officers held a slide show at the police station to display Boyle's nude photos. While we agree that this conduct is outrageous, it is irrelevant to our analysis. The slides are relevant only because they were seized illegally during the search
 
 
 [9]
 See United States v. Lambert, 887 F.2d 1568, 1572 (11th Cir.1989) (inadvertent seizure of records unrelated to drug trafficking); Henson, 848 F.2d at 1383 (inadvertent seizure of records unrelated to fraud scheme); Shilling, 826 F.2d at 1369 (seizure of file cabinet of documents, only some of which were relevant); United States v. Crozier, 777 F.2d 1376, 1381 (9th Cir.1985) (inadvertent seizure of irrelevant records); United States v. Whitten, 706 F.2d 1000, 1010 (9th Cir.1983) (seizure of boxes of letters and documents taken for later review), cert. denied, 465 U.S. 1100 (1984); Heldt, 668 F.2d at 1260-69 (seizure of documents not covered by warrant)
 
 
 [10]
 Sissler appears to argue that his statements were involuntary because he was ill at the time. However, a statement is involuntary for constitutional purposes only if it is the product of official coercion. Colorado v. Connelly, 479 U.S. 157, 167 (1986)